# United States Court of Appeals for the Federal Circuit

2007-5153

CASITAS MUNICIPAL WATER DISTRICT,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Roger J. Marzulla, Marzulla Law, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Nancie G. Marzulla and Gregory T. Jaeger.

Katherine J. Barton, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Ronald J. Tenpas, Assistant Attorney General, and Kathryn E. Kovacs, Kathleen L. Doster, and James D. Gette, Attorneys.

Lisabeth D. Rothman, Hatch & Parent, A Law Corporation, of Los Angeles, California, for amici curiae California Building Industry Association, et al.

Tara L. Mueller, Deputy Attorney General, California Office of the Attorney General, of Oakland, California, for amicus curiae California State Water Resources Control Board. With her on the brief was Clifford T. Lee, Deputy Attorney General, of San Francisco, California.

Hertha L. Lund, Wittich Law Firm, P.C., of Bozeman, Montana, for amici curiae Idaho Farm Bureau Federation, et al.

Jeffrey B. Clark, Kirkland & Ellis LLP, of Washington, DC, for amici curiae Tulare Lake Basin Water Storage District, et al. With him on the brief was Scott M. Abeles. Of counsel on the brief was William C. Kuhs, Kuhs & Parker, of Bakersfield, California.

William P. Pendley, Mountain States Legal Foundation, of Lakewood, Colorado, for amicus curiae Mountain States Legal Foundation. With him on the brief was J. Scott Detamore.

John D. Echeverria, Environmental Law & Policy Institute, Georgetown University Law Center, of Washington, DC, for amicus curiae Natural Resources Defense Council. Of counsel on the brief was Katherine S. Poole, Natural Resources Defense Council, of San Francisco, California.

J. David Breemer, Pacific Legal Foundation, of Sacramento, California, for amicus curiae Pacific Legal Foundation.

Jennifer L. Spaletta, Herum Crabtree Brown, of Stockton, California, for amicus curiae Stockton East Water District.

Appealed from: United States Court of Federal Claims

Senior Judge John P. Wiese

# United States Court of Appeals for the Federal Circuit

2007-5153

CASITAS MUNICIPAL WATER DISTRICT,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 05-CV-168, Senior Judge John P. Wiese.

_____

DECIDED:  September 25, 2008

_____

Before MAYER, SCHALL, and MOORE, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> MOORE.  Opinion dissenting-in-part filed by <u>Circuit Judge</u> MAYER.

MOORE, <u>Circuit Judge</u>.

Casitas Municipal Water District (Casitas) appeals the judgment of the United States Court of Federal Claims granting summary judgment in favor of the government holding that there was no governmental breach of contract and no compensable taking under the Fifth Amendment.  We affirm-in-part, reverse-in-part, and remand.

BACKGROUND

Congress authorized the construction of the Ventura River Project (Project) on March 1, 1956.  Pub. L. No. 423, 70 Stat. 32 (1956).  The Project provides the water supply for farmland irrigation and municipal, domestic, and industrial uses in Ventura County, California.  The Project comprises, among other things, the Casitas Dam, Casitas Reservoir, Robles Diversion Dam, and the Robles-Casitas Canal.  More specifically, the Project combines water of Coyote Creek and Ventura River in its principal feature, the Casitas Reservoir, generally called Lake Casitas.  Lake Casitas itself is located on Coyote Creek and is formed by Casitas Dam.  Approximately sixty percent of the Project's water comes from Coyote Creek.  The remaining forty percent of the Project's water comes from the nearby Ventura River.  Ventura River water is diverted via the Robles Diversion Dam into a four and a half mile long canal (the Robles-Casitas Canal), which carries the water to Lake Casitas.  Water from Lake Casitas is distributed for use via a conveyance system comprising thirty-four miles of pipeline, five pumping stations, and six balancing reservoirs.  The project is shown in Figure 1.

Figure 1:  Ventura River Project



On March 7, 1956, the United States and Casitas entered into a contract providing for the construction of the Project by the United States in exchange for a commitment by Casitas to repay the construction costs over a forty-year period,[1] as well

---

[1] Article 2 of the contract provided that the United States would spend no more than $27.669 million, later increased to $31 million, to construct the Project. Article 5 provided that Casitas would repay to the United States the actual reimbursable cost, but not in excess of $27.5 million, later increased to $30.9 million, plus certain interest.

as all operation and maintenance costs.[2] Additionally, the contract provided in Article 4 that Casitas "shall have the perpetual right to use all water that becomes available through the construction and operation of the Project." The contract also required Casitas to apply to the State of California to appropriate the water for the Project. State water permits were issued to Casitas on May 10, 1956, and the Project was completed and transferred to Casitas for operation in 1959.

In August, 1997, almost forty years after the construction of the project, the National Marine Fisheries Service (NMFS) listed the West Coast steelhead trout as an endangered species in the Project watershed. Section 9 of the Endangered Species Act (ESA) makes it illegal to "take" any species listed as endangered under the Act.[3] 16 U.S.C. § 1538. To avoid ESA section 9 liability, the Bureau of Reclamation (BOR) sought a biological opinion by the NMFS (BiOp) pursuant to section 7 of the ESA. Id. § 1536(a)(2). For the purposes of this appeal, the government concedes that the BOR's May 2, 2003 directive advising Casitas that it was obligated to comply with the requirement of the BiOp compelled Casitas to: (1) construct a fish ladder facility, which is located at the intersection of the Ventura River, Robles Diversion Dam, and the Robles-Casitas Canal; and (2) divert water from the Project to the fish ladder, resulting in a permanent loss to Casitas of a certain amount of water per year.[4] Under protest

---

[2] Article 7 of the contract provided for the transfer to Casitas of the Project's operation, at which time Casitas agreed to "take over and at its own expense operate and maintain the project works," and "without expense to the United States, to care for, operate and maintain the transferred works."

[3] "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

[4] Appellee's Br. at 2-3 n.1 ("Although the parties dispute the factual question whether Reclamation required Casitas to install the fish ladder and comply with the operational criteria [i.e. divert water], we assume it was required to do so for the

Casitas complied, but on January 26, 2005, Casitas filed suit against the government alleging that these actions constituted a breach of contract and a compensable Fifth Amendment taking of its water.

After filing its answer, the government filed a motion for summary judgment seeking to resolve the breach of contract claim, and a motion for partial summary judgment regarding the takings claim. In this latter motion, the government requested the trial court to determine the appropriate takings standard to be applied to Casitas' claim that the government's appropriation of water to operate the fish ladder constituted a compensable taking.

With respect to the breach of contract claim, Casitas contended that the United States breached the 1956 repayment contract by ordering Casitas to pay the costs of installing the fish ladder, which allegedly brought the total reimbursable project construction costs to more than the contract's $30.9 million limit. Casitas also argued that the BiOp's provision for changes to the Project's operating criteria breached Article 4 of the contract.

On October 2, 2006, the trial court granted summary judgment on the contract claims in favor of the United States. See Casitas Mun. Water Dist. v. United States, 72 Fed. Cl. 746 (2006) (Casitas I). Relying principally upon the Supreme Court's decision in Nampa & Meridian Irrigation District v. Bond, 268 U.S. 50 (1925), the trial court ruled

purposes of this appeal from the [Court of Federal Claim's] ruling on summary judgment."); Appellee's Br. at 14 n.4 ("[U]nder the revised operating criteria Casitas sometimes will be able to divert less water than it could have without the fish ladder."). The parties dispute the amount of actual water Casitas has lost due to the diversion to the fish ladder. Casitas argues that the amount of loss is up to 3,200 acre-feet per year. The government argues the amount of loss of water in Lake Casitas due to the operation of the fish ladder was 1,349 acre-feet as of May 2006, but that this amount may decrease in the future. Appellee's Br. at 14.

that the costs associated with the construction of the fish ladder facility, more than forty years after the Project's initiation, were in the nature of operation and maintenance costs and, thus, not reimbursable under the repayment contract. <u>Casitas I</u>, 72 Fed. Cl. at 751. The trial court held that even if Article 4 of the contract was breached by the government, the sovereign acts doctrine applied, shielding the government from liability. <u>Id.</u> at 755.

On March 29, 2007, the trial court granted the government's partial summary judgment motion and held that the regulatory takings standard applied to Casitas' claim rather than the physical takings standard. <u>Casitas Mun. Water Dist. v. United States</u>, 76 Fed. Cl. 100, 105-06 (2007) (<u>Casitas II</u>). While the court recognized that a prior trial court decision—<u>Tulare Lake Basin Water Storage District v. United States</u>, 49 Fed. Cl. 313 (2001), rendered by Judge Wiese who also presided in this case—held that a deprivation of water amounts to a physical taking under somewhat similar circumstances, the court concluded that the Supreme Court's intervening decision <u>Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency</u>, 535 U.S. 302 (2002), clarified takings law so as to require a different result. <u>Casitas II</u>, 49 Fed. Cl. at 106. On August 2, 2007, in response to Casitas' concession that it could not prevail under the regulatory takings framework laid out in <u>Penn Central Transportation Co. v. New York City</u>, 438 U.S. 104 (1978), the trial court dismissed the complaint and entered final judgment for the United States. Casitas appealed.

## DISCUSSION

This court reviews a grant of summary judgment <u>de novo</u>. <u>Anderson v. United States</u>, 344 F.3d 1343, 1349 (Fed. Cir. 2003). Summary judgment is only appropriate if

the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ct. Fed. Cl. R. 56(c); see also Fed. R. Civ. P. 56(c). In reviewing the record, the appellate court must draw all justifiable inferences in favor of the party opposing summary judgment. Turner v. United States, 901 F.2d 1093, 1095 (Fed. Cir. 1990). Contract interpretation is a question of law, which this court reviews de novo. Greenbrier v. United States, 193 F.3d 1348, 1354 (Fed. Cir. 1999). The issue of whether a taking has occurred also is a question of law, reviewed de novo, based on factual underpinnings. Stearns Co. v. United States, 396 F.3d 1354, 1357 (Fed. Cir. 2005).

## I. CONTRACT CLAIMS

Casitas argues that the United States' enforcement of the ESA breached the repayment contract by requiring Casitas to install a fish ladder and to change its operational criteria, resulting in a loss of water to Casitas. The government argues that the contract's terms neither indemnify Casitas for installing and paying for the fish ladder, nor guarantee it a water supply. The government also argues that, even assuming the contract imposed on the United States the contractual duties alleged by Casitas, Casitas' breach of contract claims are barred by the sovereign acts doctrine.

### A. Operational & Maintenance Costs

Casitas contends that the fish ladder is part of the United States' construction obligation under Article 2 of the contract, and that Casitas is indemnified from paying its costs by the contract's $30.9 million cap on Casitas' responsibility to reimburse those construction costs. The government argues that the fish ladder is part of an operation and maintenance cost allocated to Casitas under Article 7 of the contract, which

provides that upon notice of transfer of the Project to Casitas by the United States, Casitas "agrees to accept . . . the care, operation, and maintenance of the transferred works and thereafter, without expense to the United States, to care for, operate and maintain the transferred works." The government argues that the trial court correctly relied on the Supreme Court's decision in Nampa to conclude that the costs of constructing the fish ladder were operation and maintenance costs allocated to Casitas under the contract, because these costs were incurred to "'remedy conditions brought about by the use of the system.'" Casitas I, 72 Fed. Cl. at 750 (quoting Nampa, 268 U.S. at 53) (emphasis in original).

We agree with the government. Similar to the instant case, Nampa involved the classification of construction costs under a repayment contract between an irrigation district and the BOR. The Supreme Court opined that costs associated with the construction of a drainage system built to relieve the injurious effects of a rise in groundwater levels caused by the irrigation project constituted operation and maintenance costs and not construction costs. Nampa, 268 U.S. at 53-54. The Supreme Court explained:

> Expenditures necessary to construct an irrigation system and put it in condition to furnish and properly to distribute a supply of water are chargeable to construction; but when the irrigation system is completed, expenditures made to maintain it as an efficient going concern and to operate it effectively to the end for which it was designed, are, at least generally, maintenance and operating expenses. The expenditure in question was not for extensions to new lands or for changes in or additions to the system, . . . but was for the purpose of overcoming injurious consequences arising from the normal and ordinary operation of the completed plant which, so far as appears, was itself well constructed.

Id. 53-54. The trial court correctly reasoned that this case, like Nampa, involved costs that were incurred after the project was completed to remedy injurious effects resulting

from the project's subsequent operation. Here, the Project's operation without a fish ladder threatened the survivability of the West Coast steelhead trout, and in <u>Nampa</u> the water project's operation threatened rising groundwater levels that would harm the arability of the land. <u>See</u> <u>id.</u> If the remedial work required in <u>Nampa</u> was an operational cost rather than a construction cost, so too is the installation of the fish ladder.

Casitas' attempts to distinguish <u>Nampa</u> are unpersuasive. First, Casitas argues that the trial court erred by ignoring the definition of construction charges in Article 9[5] of the contract, which it asserts is distinguishable from the definition of construction charges used in <u>Nampa</u>.[6] However, Casitas fails to explain how the language of Article 9 materially differs from the definition of construction charges in <u>Nampa</u>. <u>See</u> <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[M]ere statements of disagreement with the district court . . . do not amount to a developed argument."). Moreover, Article 9 does not describe the scope of the United

---

[5] Article 9 provides:
The actual cost of the project works which will constitute the District's construction obligation shall embrace all expenditures of whatsoever kind in connection with, growing out of, or resulting from work performed in connection with the project works, including but not limited to the cost of labor, material, equipment, engineering, and legal work, superintendence, administration and overhead, right-of-way, property and damage of all kinds, and shall include all sums expended by the Bureau of Reclamation in surveys and investigations in connection with the project works, both prior to and after the execution of this contract, the expense of all soil investigations and other preliminary work, and the cost of moveable property which may be transferred to the District . . . .

[6] The Supreme Court in <u>Nampa</u> relied on "Section 4 of the Reclamation Extension Act of August 13, 1914, c. 247, 38 Stat. 686, 687, which provides that no increase in construction charges shall be made after the same have been fixed except by agreement between the Secretary of the Interior and a majority of the water right applicants and entrymen to be affected thereby." 268 U.S. at 52.

States' construction obligation, which is defined in Articles 2 and 5.[7] Article 9 merely provides that whatever project works are considered part of the construction obligation, the cost of those works will include all associated expenditures, such as labor, material, overhead, etc. Thus, if the fish ladder were deemed part of the construction obligation, Article 9 would require that the United States pay all costs associated with the fish ladder.

Second, Casitas argues that Nampa dictates that operation and maintenance costs are only those that have to do with the water supply functions of a reclamation project and that the fish ladder is not related to the water supply functions of the Project.[8] However, Casitas constructed the fish ladder for purposes of ensuring that the Project could continue to operate without violating ESA. Casitas recognized that once the West Coast steelhead trout was listed as endangered, Casitas and its officers could be subject to civil and criminal liability for continuing to operate the Project in the absence of an incidental take permit. See 16 U.S.C. §§ 1539 (a)(1)(b)-(2)(A) (noting an

---

[7] Article 5, entitled "Payment by District," provides that construction costs comprise all costs incurred by the United States "in providing the project works," and thus extends only to costs incurred in the completion of the project and not to construction costs that may arise after completion. That reading of the contract is supported by Article 2, entitled "Construction of Works and Limit of Expenditures Therefore," which provides, in subsection (a), that the United States will spend no more than $31 million or so much thereof as the contracting officer deems necessary "for the completion of the project works," and further provides, in subsection (b), that when the government notifies Casitas that construction expenditures have been determined, "the project works system shall be deemed to have been completed within the meaning of this contract." The United States notified Casitas that construction was complete in 1968. Thus, the construction of the project works is deemed completed under the contract and any obligation of the United States discharged.

[8] Specifically, Casitas relies on the Nampa Court's description of operation and maintenance costs as "expenditures made to maintain [an irrigation system] as an efficient going concern and to operate it effectively to the end for which it was designed . . . ." 268 U.S. at 53.

incidental take permit is granted if the taking will be incidental to otherwise lawful activity by the party, as long as the party has devised an appropriate conservation plan that minimizes the impact of the taking on the endangered species). Casitas' construction of the fish ladder enabled it to obtain incidental take protection and continue the Project's operation.

Finally, Casitas argues that there was no support for the trial court's factual finding that the operation of the Project caused harm to the West Coast steelhead trout, making the construction of the fish ladder necessary. Casitas I, 72 Fed. Cl. at 751. We disagree. The record is replete with evidence, including from Casitas' own consultants, that the Project has blocked the West Coast steelhead trout's access to miles of prime spawning and rearing habitat for nearly fifty years, and that such water development is a contributor to the trout's endangerment.

In sum, we hold that the installation of the fish ladder is a maintenance and operational cost chargeable to Casitas.

**B. Use Right of Water**

Casitas' second principal argument with respect to the breach of contract claim involves the use right of water. Specifically, Casitas argues that BOR's requirement that Casitas devote a portion of its water to the operation of the fish ladder constitutes a breach of Article 4 of the contract. Article 4 provides that "the District shall have the perpetual right to use all water that becomes available through the construction and operation of the Project . . . ." The government argues that this provision of the contract does not constitute a promise by the United States that Casitas may divert all available water not needed for vested rights from the Ventura River. The government argues that

the language of Article 4 pertains only to Casitas' right to "water that <u>becomes available</u> through the construction and operation of the Project" (emphasis added), which the government contends refers to the water stored in Lake Casitas, not the water that flows in the Ventura River. The government contends that Article 4 is "simply an acknowledgment of Casitas' existing right to the use of the project water as granted under a permit issued by the State [of California] Water Resources Control Board"—that is, it "merely recites a condition of the parties' exchange and as such places no affirmative obligation on BOR to act as the guarantor of Casitas' water supply." Id. at 753.

We disagree with the government's construction of Article 4. First, the contract's description of the Project, which specifically identifies Robles Diversion Dam as part of the Project, contradicts the government's contention that Project water includes only water in Lake Casitas, and not Ventura River water impounded behind Robles Diversion Dam. The contract identifies: "[T]he Ventura River Project, comprising Casitas Dam and Reservoir, Robles Diversion Dam, Robles-Casitas Canal and a main conveyance system consisting of pipelines, pumping plants, balancing reservoirs, and necessary appurtenances . . . ." Therefore, we find the government's argument that Article 4 refers to water stored only in Lake Casitas unpersuasive.

Further, contrary to the government's contention, Casitas never asserts that Article 4 provides a federal guarantee of unlimited access to the water of the Ventura River. Instead, Casitas contends that the government's appropriation of water for the fish ladder is independent from any limits that the State of California place on Casitas' water rights. Casitas recognizes that its water rights from the State of California places

an upper limit on the quantity Casitas may appropriate from the Ventura River. Specifically, Casitas acknowledges that the California license governing its use of water for the Project permits Casitas to divert up to 107,800 acre-feet per year from the Ventura River and to put up to 28,500 acre-feet of water per year to beneficial use. Casitas argues that Article 4 constitutes a guarantee from the government that it will not appropriate any of the Project water for other uses. We agree with Casitas that Article 4 constitutes a promise by the United States that Casitas shall have the perpetual right to water made available by construction and operation of the Project and that the United States will not appropriate any of the Project water for other uses (i.e., fish ladder or delivery under water contracts). However, this does not end our inquiry.

## C. Sovereign Acts Doctrine

The government argues that the issuance of the NMFS BiOp and the adoption of the BiOp by the BOR are sovereign acts. As such, the government contends that it cannot be held liable for failure to perform its contractual duties under Article 4. We agree.

Under the sovereign acts doctrine, "'the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as sovereign.'" Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1574 (Fed. Cir. 1997) (quoting Horowitz v. United States, 267 U.S. 458, 461 (1925)). The doctrine is based on the theory that "[t]he two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other." Id. (quoting Jones v. United States, 1 Ct.

Cl. 383, 384 (1865)).  However, even if the sovereign acts defense applies, "it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach."  Carabetta Enters. v. United States, 482 F.3d 1360, 1365 (Fed. Cir. 2007) (quoting Winstar v. United States, 518 U.S. 839, 895 (1996)).  Specifically, performance by the government is excused under the sovereign acts defense only when the sovereign act renders the government's performance impossible.  See, e.g., Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002).

Casitas argues that the sovereign acts doctrine does not apply because the ESA did not make it impossible for the government to perform its contractual obligations.  Casitas contends that alternative performance was available to the government—a more modest fish ladder or a system for fish passage other than the fish ladder (e.g., fish trapping and trucking) that would have met ESA requirements without requiring a loss of water to Casitas.  Casitas asserts that the absence of a specific directive in the ESA regarding the means of ensuring fish preservation and the availability of an alternative approach to accomplish that goal without accompanying water loss defeats the sovereign acts doctrine.

Casitas' argument necessarily assumes that the sovereign act consists solely of the ESA and that NMFS' issuance of the BiOp and the BOR decision to adopt the BiOp, which the parties concede required Casitas to construct the fish ladder, were not part of a sovereign act.  Casitas' interpretation of what constitutes a sovereign act is too narrow.  The NMFS is an agency within the Commerce Department's National Oceanic

and Atmospheric Administration that implements the ESA for marine species.[9]  The BOR is a federal agency within the Department of Interior.  We see no difference between situations when Congress either delineates the implementing details within the statute or when Congress leaves these details to the discretion of an agency.  Cf. Bennett v. Spear, 520 U.S. 154, 170 (1997) (stressing the "powerful coercive" and "virtually determinative" effect of biological opinions).  In either case, the governmental action is sovereign in character and the sovereign acts doctrine may be invoked.  As such, the trial court correctly concluded that Casitas' argument fails because it makes an impermissible distinction "between statutes whose implementing details have been spelled out by Congress and statutes whose implementation Congress has left for administrative determination." Casitas I, 72 Fed. Cl. at 755.  We hold that the BiOp opinion and the decision of the BOR to adopt the BiOp opinion are sovereign acts.  As such, it was impossible for the government to perform its contractual requirements under Article 4.  Therefore, the government is not liable for breaching Article 4 of the contract.

## II.  TAKINGS

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  The Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking."  First English Evangelical Lutheran Church of Glendale v. County of L.A., 482 U.S. 304, 315 (1987) (emphasis in the original).  The

---

[9]    Casitas admits that it was within NMFS' discretion to determine that a fish ladder was the appropriate remedy for the West Coast steelhead trout.

Supreme Court has emphasized that the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

To begin, we note that the government has conceded that Casitas has a valid property right in the water in question. Specifically, the government has conceded that Casitas has a right both to divert 107,800 acre-feet of water and to use 28,500 acre-feet of such diverted water. Def.'s Reply Supp. Mot. Partial Summ. J. at 3-4 ("Plaintiff [characterizes its property interest] in its opposition brief [as follows]: 'In this case, Casitas claims the right to divert through the Ventura River Project 107,800 acre-feet of water from the Ventura River per year and the right to put 28,500 acre-feet of water to beneficial use each year . . . .' [I]n order to streamline this summary judgment process, and to avoid any unnecessary confusion in the resolution of the nature or type of taking at issue in this case (i.e., physical or regulatory) defendant will assume for purposes of this motion that plaintiff's characterization of the scope of its property interests is correct."). However, before considering whether the diversion of Casitas' water to the fish ladder is best analyzed under the rubric of a physical or regulatory taking, it is useful to review the distinctions traditionally made between the two doctrines.

A physical taking is the "paradigmatic taking" and occurs by "a direct government appropriation or [a] physical invasion of private property." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005). The jurisprudence pertaining to physical takings "involves the straightforward application of per se rules." Brown v. Legal Found. of Wash., 538 U.S. 216, 233 (2003) (emphasis in original). The size and scope of a

physical invasion is immaterial to the analysis; even if the government only appropriates a tiny slice of a person's holdings, a taking has occurred, and the owner must be provided just compensation. Tahoe-Sierra, 535 U.S. at 322.

In addition, the Supreme Court precedents "stake out two categories of regulatory action that generally will be deemed per se takings." Lingle, 544 U.S. at 538. Regulatory action will be deemed a per se taking when the government requires "an owner to suffer a permanent physical invasion of her property—however minor," id. (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982)). Such action effects a physical invasion of the property and therefore qualifies as a physical taking. Additionally, regulatory action can qualify as a per se taking when the regulation "completely deprive[s] an owner of 'all economically beneficial use' of her property," id. (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1992)).

Regulatory takings analysis outside the context of a physical or other per se taking is "more complex." Tahoe-Sierra, 535 U.S. at 322 n.17. "[R]egulatory takings jurisprudence . . . is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances.'" Id. at 321 (citations omitted). While there is no "set formula" for evaluating regulatory takings claims, courts typically consider whether the restriction has risen to the level of a compensable taking under the multi-factor balancing test articulated in Penn Central, 438 U.S. at 124. Lingle, 544 U.S. at 538-39 (citations omitted).

A trilogy of Supreme Court cases involving water rights provides guidance on the demarcation between regulatory and physical takings analysis with respect to these rights. In International Paper Co. v. United States, 282 U.S. 399 (1931), the United

States, during World War I, issued a requisition order for all of the hydroelectric power of the Niagara Falls Power Company (Niagara Power). Id. at 405. At the time that the United States' order was issued, Niagara Power leased a portion of its water to International Paper Company (International Paper), which diverted the water via a canal to its mill. Id. at 404-05. In response to the United States' direction to "cut off the water being taken" by International Paper to increase power production, Niagara Power terminated the diversion of water to International Paper. Id. at 405-06. This termination resulted in International Paper being unable to operate its mill for nearly nine months. Id. The United States did not take over the operations of either Niagara Power or International Paper, nor did it physically direct the flow of the water. Instead, the United States caused Niagara Power to stop International Paper from diverting water to its mill so that the water would instead be available for third party use—"private companies for work deemed more useful [by the government] than the manufacture of paper." Id. at 404. This third party use served a public purpose of supplying power for the war effort. The Supreme Court found that the government directly appropriated water that International Paper had a right to use.

In United States v. Gerlach Live Stock Co., 339 U.S. 725 (1950), the claimants held riparian water rights for irrigation of their grasslands by natural seasonal overflow of the San Joaquin River, id. at 729-30. The BOR built Friant Dam, a part of the Central Valley Project, upstream from the claimants' land. Id. at 730, 734. The Friant Dam was built to store high stage river flows which then were "diverted . . . through a system of canals and sold to irrigate more than a million acres of land." Id. at 729. As a result, "a dry river bed" was left downstream of the dam, and the overflow irrigation of the

claimants' lands virtually ceased.  Id. at 729-30.  Thus, the United States caused water to be physically diverted away from the claimants for third party use—delivery under water contracts.  The Friant Dam served a public purpose of "mak[ing] water available where it would be of the greatest service."  Id. at 728.  The Supreme Court analyzed the government's action as a physical taking.

Dugan v. Rank, 372 U.S. 609 (1963), similarly involved claims arising out of the United States' physical diversion of water for third party use, by the Friant Dam.  In Dugan, landowners along the San Joaquin River, owning riparian and other water rights in the river, alleged that the BOR's storage of water upstream behind Friant Dam left insufficient water in the river to supply their water rights.  Id. at 614, 616.  The Supreme Court agreed, and analyzed the government's physical appropriation of water as a physical taking.

We agree with both parties that, in each of these cases, the United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property.  We also agree that in each of these cases the diverted water was dedicated to government use or third party use which served a public purpose.  Additionally, we agree that the Supreme Court analyzed the government action in each of these cases as a per se taking.  Finally, we concur with the government that our focus should primarily be on the character of the government action when determining whether a physical or regulatory taking has occurred.

The government contends that this trio of Supreme Court cases is distinguishable from the instant case because they involve direct appropriations of property as opposed to restrictions on use of natural resources.  The government

argues that it did not seize, appropriate, divert, or impound any water, but merely required water to be left in the stream.

Here, the government admits for the purposes of summary judgment that it required Casitas to build the fish ladder facility, which is a man-made concrete structure that was not a portion of the existing Ventura River.[10]  Appellee's Br. at 2-3 n.1 ("Although the parties dispute the factual question whether Reclamation required Casitas to install the fish ladder and comply with the operational criteria, we assume it was required to do so for the purposes of this appeal from the [Court of Federal Claim's] ruling on summary judgment."), 22 n.6 ("Reclamation never required Casitas to install the fish ladder or comply with the operating criteria in the BiOp.  For the purposes of this appeal from the [Court of Federal Claim's] summary judgment rulings, however, the United States assumes . . . that Casitas' factual allegation is correct . . . .").

Figure 2 is a depiction of the fish ladder facility, along with part of the Ventura River, Robles-Casitas Canal, and Robles Diversion Dam.[11]  The fish ladder facility allows both upstream and downstream fish migration.  The arrows in Figure 2 show the direction of upstream fish migration.  In upstream migration, fish enter the fish entrance,

---

[10]     During oral arguments, the government argued that neither the BOR nor the BiOp required Casitas to build the fish ladder, but rather the BiOp simply required Casitas to leave water in stream.  Oral Arg. 18:18-19:45.  We do not address whether the government required Casitas to build the fish ladder because the government conceded in its brief that it did.  Appellee's Br. at 2-3 n.1, 22 n.6.

[11]     The Robles Diversion Dam operates any time of the year that adequate flows are available in the Ventura River.  This occurs when there has been a large enough rainfall event to allow the forebay basin to fill while still meeting downstream release criteria for water rights.  Once the forebay basin has filled, three radial gates (canal entrance gates) allow intake to the diversion flume, which serves as the entry to the Robles-Casitas Canal.  Water reaching the Robles Diversion Dam that does not enter the diversion flume continues downstream in the Ventura River (either by passing through four radial gates (spillway gates) or by spilling over the cutoff wall).  Curtis E. Spencer, Expert Report at 4.

continue through the fish ladder, and swim through the diversion flume where they exit through the low flow or high flow exits. During downstream migration, fish enter the diversion flume, where the fish screens and brush system guide fish into the fish ladder (preventing the fish from entering Lake Casitas via the Robles-Casitas Canal).

Figure 2: Fish Ladder Facility



The government also admits that the operation of the fish ladder required water, which prior to the fish ladder's construction flowed into the Casitas Reservoir via the Robles-Casitas Canal, to be physically diverted away from the Robles-Casitas Canal and into the fish ladder. Oral Arg. 26:12-26:32; 31:11-31:30. Specifically, the government admits that the operation of the fish ladder includes closing the overshot gate, see Figure 2, which is located in the Robles-Casitas Canal, and that the closure of this gate causes water that would have gone into the Casitas Reservoir via the Robles-

Casitas Canal to be diverted into the fish ladder.[12]  Id. at 30:15-30:38.  These admissions make clear that the government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the Robles-Casitas Canal—after the water had left the Ventura River and was in the Robles-Casitas Canal—and towards the fish ladder, thus reducing Casitas' water supply.[13]

The active hand of the government was also at play in International Paper, where the Court remarked that "[t]he petitioner's right was to the use of the water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use."  282 U.S. at 407.  Similar to the petitioner in International Paper, Casitas' right was to the use of the water, and its water was withdrawn from the Robles-Casitas Canal and turned elsewhere (to the fish ladder) by the government.[14]  Although Casitas' right was only partially impaired, in the physical taking jurisprudence any impairment is sufficient.  See Tahoe-Sierra, 535 U.S. at 322.  The Supreme Court in Dugan held that a partial impairment of the petitioner's water rights was a taking,

---

[12]    The operation of the fish ladder facility was originally described by Casitas' attorney.  Oral Arg. 6:20-6:37

[13]    Contrary to the government's assertions, the appropriate reference point in time to determine whether the United States caused a physical diversion is not before the construction of the Project but instead the status quo before the fish ladder was operational.  The Project was constructed almost forty years prior to the construction of the fish ladder facility.  Water that is now being diverted to the fish ladder facility had been flowing down the Casitas-Robles Canal since the late 1950s.

[14]    We note that a dispute in the amount of water lost by Casitas does not prevent a finding of a taking.  See Dugan, 372 U.S. at 623 (finding "no uncertainty in the taking" even though the "Government did not announce that it was taking water rights to a specified number of 'gallons' or, for that matter, 'inches' of water").

> Having plenary power to seize the whole of respondents' rights in carrying out the congressional mandate, the federal officers a fortiori had authority to seize less. It follows that if any part of respondents' claimed water rights were invaded it amounted to an interference therewith and a taking thereof . . . .

372 U.S. at 623. Therefore, we conclude that the government physically appropriated water that Casitas held a usufructuary right in.

The government also argues that, in contrast to the trilogy of Supreme Court cases, here, the United States did not appropriate the water for its own use or for use by a third party. We find this argument unpersuasive. The government, by passing the ESA, has recognized the importance of protecting endangered species. In fact, the purpose of the ESA is express in the statute itself. 16 U.S.C. § 1531(a)-(c). Specifically, Congress found that "species of fish . . . have been so depleted in numbers that they are in danger of or threatened with extinction" and that "these species of fish . . . are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." Id. § 1531(a)(2)-(3). Congress also found that "encouraging . . . interested parties . . . to develop and maintain conservation programs . . . is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish . . . ." Id. § 1531(a)(5). In light of these findings, there is little doubt that the preservation of the habitat of an endangered species is for government and third party use—the public—which serves a public purpose. Cf. Kelo v. City of New London, 545 U.S. 469, 485 (2005) (upholding government use of eminent domain to acquire land for transfer to private parties when it serves a broadly defined public purpose like economic development). When the government forces Casitas to divert water away from the Robles-Casitas Canal to the fish ladder for the public purpose of protecting the West

Coast Steelhead trout, this is a governmental use of the water. The fact that the government did not itself divert the water is of no import. The government admits that Casitas was forced by the BOR adoption of the BiOp to build the fish ladder and divert the water. If this water was not diverted for a public use, namely protection of the endangered fish, what use was it diverted for?

Finally, the government attempts to distinguish this trio of Supreme Court cases on the basis that the physical diversion of water by the government in each of these cases was part of an undisputed exercise of the United States' eminent domain powers. The government argues that physical takings are usually obvious and that the government's exercise of eminent domain powers or alternatively the government's offer to purchase the rights in advance is evidence of the obviousness of the physical taking in International Paper, Dugan, and Gerlach. Oral Arg. 34:00-34:23; see, e.g., Tahoe-Sierra, 535 U.S. at 322 n.17 ("When the government . . . physically appropriates the property, the fact of a taking is typically obvious and undisputed."). However, at the time International Paper, Dugan, and Gerlach were litigated, the government did not appear to take the position that the takings of water rights in those cases were obvious. In International Paper, the government promised to pay "fair and just compensation" for all of the hydroelectric power of the Niagara Falls, but the Court noted the government exercised eminent domain power only up to "the time . . . to pay for what it has had." 282 U.S. at 405-06. In Gerlach, despite the fact that "[t]he original plan [for the Project] called for purchase of water rights" and a later Act authorized the Secretary to acquire rights by eminent domain, 339 U.S. at 734, 735 & n.8, the government argued that deprivation of water rights was not compensable because the "overall project . . . ha[d]

been authorized by Congress, under the commerce power, as a measure for control of navigation," Int'l Paper, 282 U.S. at 731.  Finally, in Dugan, although the government sought to "purchase or pay for the infringement of [water] rights," the government argued that no taking occurred.  372 U.S. at 613.  Therefore, the "obviousness" of a physical taking is not always as apparent as the government contends.

In addition, while it is true that each of these cases began with an action in which the government sought to acquire rights by purchase, it is certainly not a necessary precondition to finding a physical taking.  See, e.g., United States v. Pewee Coal Co., 341 U.S. 114, 115-16 (1951) (finding a physical taking without the government offering to acquire rights by purchase beforehand);  United States v. Gen. Motors Corp., 323 U.S. 373, 375 (1945) (same).  To hold otherwise would allow the government to circumvent paying just compensation for taking private property by simply not offering to acquire the rights in advance.

Further, the government argues that the installation and operation of the fish ladder was merely a use restriction on a natural resource, and therefore governed by the regulatory taking jurisprudence.  Specifically, the government argues the instant case is similar to United States v. Central Eureka Mining Co., 357 U.S. 155 (1958), where the government issued an order requiring a gold mine to cease operations, and to Penn Central, where the government restricted a building owner's private airspace. In both of these cases, the Supreme Court analyzed the government action as a regulatory taking.  The government contrasts the instant case with Pewee Coal, where the government took actual possession and control of a coal mine, and United States v. Causby, 328 U.S. 256 (1946), where government planes utilized private airspace.  In

each of these cases the Supreme Court analyzed the government's action as a physical taking.

The government is correct that, similar to the regulatory takings cases involving restrictions on use, the owner of the property in this case also had an expectation that was later altered by government action. However, in contrast to the restriction of use cases cited by the government, this case involves physical appropriation by the government. The United States actively caused water to be physically diverted away from Casitas after the water had left the Ventura River and was in the Robles-Casitas Canal. Like Pewee Coal, the government, in this case, took physical possession of the water. By its own admission, the government required construction of the fish ladder and compelled the water to be rerouted to the fish ladder in order for the fish ladder to operate. This is no different than the government piping the water to a different location. It is no less a physical appropriation. This is not like Central Eureka Mining, where the government merely ordered the gold mine to cease operations. 357 U.S. at 165-66. In Central Eureka Mining, the Court expressly distinguished the physical takings cases on the grounds that "[t]he Government had no need for the gold or the gold mines." Id. at 166. The government simply halted mining; it did not commandeer the gold for a public use. At the end of the regulatory restriction, the gold mine still had all of its gold and machinery. In this case, in contrast, the government did commandeer the water for a public use—preservation of an endangered species. When the government diverted the water to the fish ladder, it took Casitas' water. The water, and

Casitas' right to use that water, is forever gone.[15]  As such, this case is more closely analogous to Pewee Coal and Causby than Penn Central and Central Eureka Mining.

Finally, the government argues that Hudson County Water Co. v. McCarter, 209 U.S. 349 (1908), is applicable here.  In Hudson, the Court held that a New Jersey statute that barred a water company, which held riparian water rights in the Passaic River, from diverting water to New York did not constitute an unconstitutional taking. The Court concluded that the State's requirement that the river be maintained "substantially undiminished . . . justifies the cutting down by statute, without compensation, in the exercise of the police power, of what otherwise would be private rights of property."  Hudson County, 209 U.S. at 356.  The government contends that the Court thus declined to apply a per se physical takings analysis to the regulatory requirement that water be left in the river.  We do not find the government's argument persuasive.  First, the Supreme Court held there was no taking because the riparian water right granted to Hudson by the State of New Jersey did not include the right to transfer fresh, surface water out of state to New York pursuant to contract:

> The right to receive water from a river through pipes is subject to territorial limits by nature, and those limits may be fixed by the State within which the river flows, even if they are made to coincide with the state line.

Id. at 357.  Since Hudson did not hold this property right, the government's restriction did not take anything that Hudson owned.  In this case, the government admits Casitas holds a valid property right to the water; hence, unlike in Hudson, the government's actions here are taking Casitas' property right.

---

[15]  The California license governing Casitas' use of water for the Project permits Casitas to divert up to 107,800 acre-feet per year from the Ventura River and to put to beneficial use each year 28,500 acre-feet of the diverted water.  The water diverted to the fish ladder facility is gone forever, as the license does not allow Casitas to make up this amount in subsequent years.

Moreover, in the instant case, the government admissions make clear that the United States did not just require that water be left in the river, but instead physically caused Casitas to divert water away from the Robles-Casitas Canal and towards the fish ladder. Where the government plays an active role and physically appropriates property, the per se taking analysis applies.

We conclude by noting that the Supreme Court's decision in Tahoe-Sierra did not depart from the substantial body of precedent dictating that the government's physical appropriation of a portion of a water right is compensable.[16] In Tahoe-Sierra, the

---

[16] We note that prior to Tahoe-Sierra, the Court of Federal Claims decided Tulare in favor of the plaintiffs holding that "the federal government, by preventing plaintiffs from using the water to which they would otherwise have been entitled, [has] rendered the usufructuary right to that water valueless, [and has] thus effected a physical taking." Tulare, 49 Fed. Cl. at 318. The trial court concluded that in Tulare it improperly focused on "the finality of the plaintiffs' loss rather than upon the character of the government's action." Casitas II, 76 Fed. Cl. at 104. We do not opine on whether Tulare was rightly decided, but note that the Tulare decision has been criticized. First, Tulare has been criticized for failing to engage in a thorough analysis of whether the plaintiff had a vested property right in the water in question. See Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, 538 (2005) (criticizing Tulare for failing to adequately consider whether the contracts were limited in the event of water shortage by prior contracts, prior appropriations, or other state law principles); Allegretti & Co. v. County of Imperial, 42 Cal. Rptr. 3d, 131-32 (4th Cir. 2006) (same); Meeker v. Belridge Water Storage Dist., 2006 U.S. Dist. LEXIS 91774, at *36 (E.D. Cal. Jan. 17, 2006) (same); Melinda Harm Benson, The Tulare Case: Water Rights, the Endangered Species Act, and the Fifth Amendment, 32 Envtl. L. 551, 585 (2002) (arguing that if Tulare had examined state law, it would have concluded that the plaintiffs lacked a protected property interest). In the instant case, the government has conceded that Casitas has a valid property right in the water at issue. Second, Tulare has been criticized for focusing on the results of the government action rather than on the character of the government action. See Allegretti, 138 Cal. App. 4th at 1275 (criticizing Tulare for its conclusion "that the government's imposition on pumping restrictions is no different than an actual physical diversion of water" because "the government's passive restriction, which required the water users to leave water in the stream, did not constitute a physical invasion or appropriation"). In the instant case, the government's admissions made clear that it did not merely require water to be left in stream, but instead actively caused the physical diversion of water away from the Robles-Casitas Canal and towards the fish ladder.

Supreme Court considered a taking claim involving the application of a 32-month

moratorium on land development.  The Court held that such a temporary moratorium did

not constitute a per se taking because at the end of the moratorium the owner regained

use of the land:

> An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest . . . .  Both dimensions must be considered if the interest is to be viewed in its entirety. Hence, a permanent deprivation of the owner's use of the entire area is a taking of "the parcel as a whole," whereas a temporary restriction that merely causes a diminution in value is not.  Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted.

Tahoe-Sierra, 535 U.S. at 331-32.  In Tahoe-Sierra, the Court considered and rejected

the claim of the petitioner that each day of a land use moratorium deprives the owner of

all economic use of his land, and is thus a per se taking under the rule of Lucas.

> Petitioners seek to bring this case under the rule announced in Lucas by arguing that we can effectively sever a 32-month segment from the remainder of each landowner's fee simple estate, and then ask whether that segment has been taken in its entirety by the moratoria.  Of course, defining the property interest taken in terms of the very regulation being challenged is circular.  With property so divided, every delay would become a total ban; the moratorium and the normal permit process alike would constitute categorical takings.

Id. at 330-31.  While Tahoe-Sierra emphasized the sharp distinction between physical

and regulatory takings, it did not involve a claim of physical taking, nor did it involve

water rights.  Id. at 322-23.  See Steven J. Eagle, Planning Moratoria and Regulatory

Takings: The Supreme Court's Fairness Mandate Benefits Landowners, 31 Fla. St. U. L.

Rev. 429, 443-55 (2004) (arguing that Tahoe-Sierra decoupled physical and regulatory

takings analysis).  Tahoe-Sierra did not overrule, modify, or even mention the holdings

of International Paper, Dugan, or Gerlach. As such, these cases remain good law. Tahoe-Sierra was a regulatory case—due to a moratorium the landowner was unable to develop his land for thirty-two months. The government in Tahoe-Sierra did not physically appropriate anything, but rather restricted the owner's use of his land. The landowner was prohibited from developing the land during that time. The land itself was in no way changed or diminished due to this restriction, and, as the court held, "the property will recover value as soon as the prohibition is lifted." Tahoe-Sierra, 535 U.S. at 332. The owner's land was the same after the moratorium as it was before. The regulatory restriction merely maintained the status quo.

In this case, in contrast, the water that is diverted away from the Robles-Diversion Canal is permanently gone. Casitas will never, at the end of any period of time, be able to get that water back. The character of the government action was a physical diversion for a public use—the protection of an endangered species. The government-caused diversion to the fish ladder has permanently taken that water away from Casitas. This is not temporary, and it does not leave the right in the same state it was before the government action. The water, and Casitas' right to use that water, is forever gone. Unlike Tahoe-Sierra, the government, in this case, directly appropriated Casitas' water for its own use—for the preservation of an endangered species. The government requirement that Casitas build the fish ladder and divert water to it should be analyzed under the physical takings rubric.

CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the government with respect to Casitas' breach of contract claim

and reverse the district court's grant of partial summary judgment in favor of the government with respect to a taking under the Fifth Amendment. We remand for further proceedings consistent with this opinion.[17]

AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED

---

[17] In the Court of Federal Claims, Casitas conceded that if the governmental actions at issue in this case were not analyzed under a physical taking rubric, it could not prevail. At the same time, the government made certain conditional concessions in order to put the case in a posture for summary judgment. (For example, the government conceded for the limited purpose of summary judgment that Casitas possessed a cognizable property interest.) The court thereafter granted summary judgment in favor of the government on the takings issue after determining that the governmental actions at issue did not effect a physical taking. We have reversed the grant of summary judgment in favor of the government based solely upon our determination that the governmental actions at issue in this case are properly analyzed under a physical taking rubric. On remand, after receiving the views of the parties and ruling on any matters left open during the summary judgment proceedings, the Court of Federal Claims will be in a position to determine the ultimate question of whether a taking occurred in this case. If the court determines that a taking occurred, it will be necessary for it to determine the amount of damages to which Casitas is entitled. The damages calculation may take into account the fact that Casitas' license from the State of California allowed it to divert up to 107,800 acre-feet of water per year from the Ventura River and to put to beneficial use up to 28,500 acre-feet of the diverted water.

# United States Court of Appeals for the Federal Circuit

2007-5153

CASITAS MUNICIPAL WATER DISTRICT,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 05-CV-168, Senior Judge John P. Wiese.

MAYER, <u>Circuit Judge</u>, dissenting-in-part.

In my view, the trial court correctly decided that the water use requirements imposed by the federal government on Casitas do not constitute <u>per se</u> takings of property requiring compensation under the Takings Clause. Because <u>Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Activity</u>, 535 U.S. 302 (2002), controls the question of whether the multi-factor inquiry set out in <u>Penn Central Transportation Co. v. New York City</u>, 438 U.S. 104 (1978), is the proper framework for analyzing whether a taking has occurred in this case, I dissent from the majority's contrary decision.

Casitas does not own the water in question because all water sources within California belong to the public. Cal. Wat. Code §§ 102, 1001. Whether Casitas even has a vested property interest in the use of the water is a threshold issue to be

determined under California law. California subjects appropriative water rights licenses to the public trust and reasonable use doctrines, so Casitas likely has no property interest in the water, and therefore no takings claim.[1] Assuming arguendo that there is a property interest in the water, however, the use restriction imposed is pursuant to the administration of the Endangered Species Act (ESA), and is plainly regulatory in nature. Casitas attempts to distinguish restrictions on water use from all other takings jurisprudence, arguing that a partial restriction imposed by law or regulation on an annual water use license triggers a per se rule that a physical taking has occurred. This novel formulation of a per se or categorical takings rule exclusive to water use rights is unsupported by law.

In Tahoe-Sierra, the Supreme Court distinguished between physical takings, in which the government acquires private property for a public purpose, and regulatory takings, in which a law or regulation imposes restrictions on the use of private property "so severe that they are tantamount to a condemnation or appropriation." 535 U.S. at 321-22 & n.17. When the government physically appropriates or occupies private property, the fact that a taking has occurred "is typically obvious and undisputed." Id. at 322 n.17. In contrast, when a law or regulation imposes restrictions on use of the property, courts must engage in "ad hoc, factual inquiries," focusing on the character of the action and the nature and extent of the intrusion to determine whether the law or regulation has effected a taking. Id. at 326-27. The Court has consistently explained that "while property may be regulated to a certain extent, if regulation goes too far it will

---

[1] The government confined any assumption to the contrary to its summary judgment motion, so the property interest issue would be subject to consideration on remand.

be recognized as a taking." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014 (1992) (internal quotation omitted). To determine whether a regulation has gone too far for purposes of the Fifth Amendment, courts analyze the economic impact of the regulation on the claimant and the extent to which the regulation interferes with investment-backed expectations. Penn Central, 438 U.S. at 124.

When a government statute like the ESA is facially constitutional, the relevant takings question for attendant administrative actions that restrict private property use ascertains the extent to which the government action interferes with the economic use of the property—a classic regulatory, not physical, takings problem. Stearns Co. v. U.S., 396 F.3d 1354, 1357 (Fed. Cir. 2005). Two discrete categories of regulatory action, however, are per se compensable under the takings clause without delving into a case-specific analysis: (1) where regulation has compelled an owner to endure a physical invasion of his property, and (2) where regulation deprives an owner of all economically beneficial or productive use of land, examining the parcel as a whole. Lucas, 505 U.S. at 1015. This case does not involve any sort of physical invasion, does not deprive Casitas of all economically beneficial use of its water license, and Casitas conceded that it can not prevail on the merits of a Penn Central regulatory takings claim.

No physical taking has occurred. First, because Casitas possesses a usufructuary interest in the water and does not actually own the water molecules at issue, it is difficult to imagine how its property interest in the water could be physically invaded or occupied. Cf. United States v. Causby, 328 U.S. 256, 264-66 (1946) (finding a physical taking when the government literally and physically invaded private airspace

2007-5153                                    3

with its aircraft). Further, the government has not acquired Casitas' water use license. The United States may not make proprietary use of the water denied to Casitas by the ESA, nor may it divert Casitas' use rights to a third party. Rather, the limitation imposed on the total quantity of water available for Casitas' use is directly correlated to the quantity of water needed to remain in the Ventura River's hydrologic cycle to preserve the endangered Southern California steelhead under a public program to promote the common good. See Tahoe-Sierra, 535 U.S. at 322-23 (distinguishing between government invasion or acquisition of property, which constitutes a physical taking, and government interference with a private owner's use of her property, which constitutes a regulatory taking if, after a complex factual assessment, a court determines it goes too far); Penn Central, 438 U.S. at 124 ("A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.") (internal citation omitted); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S 419, 436 (1982) (concluding that a true physical "occupation is qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion").

Nor did the government appropriate the water when it restricted Casitas' right to make use of it. An example of a physical taking by government appropriation is the seizure of possession and control of a privately owned coal mine. Compare United States v. Pewee Coal Co., 341 U.S. 114, 116 (1951) (finding a physical taking where

the government placed placards reading "United States Property!" on the premises and actually became engaged in the coal mining business), with United States v. Central Eureka Mining Co., 357 U.S. 155, 165-68 (1958) (analyzing a wartime Act prohibiting operation of gold mines as a regulatory taking, because "it is clear from the record that the Government did not occupy, use, or in any manner take physical possession of the gold mines or of the equipment connected with them."). In Tahoe-Sierra, a moratorium on land development did not amount to a physical taking. 535 U.S. at 324-25 ("This case does not present the classi[c] taking in which the government directly appropriates private property for its own use; instead the interference with property rights arises from some public program adjusting the benefits and burdens of economic life to promote the common good.") (internal citations and quotations omitted). Similarly, a moratorium on development of a portion of Casitas' water use rights, imposed while the steelhead trout remains endangered, falls into the category of nonpossessory governmental activity. As long as regulatory restrictions do not require a private property owner to suffer the government's physical occupation, they should be analyzed "under the multifactor inquiry generally applicable to nonpossessory governmental activity." Id. at 323-24 & n.18; Loretto, 458 U.S at 440 (citing Penn Central, 438 U.S. 104 (1978)); see also Goodrich v. United States, 434 F.3d 1329, 1333-34 (Fed. Cir. 2006) (affirming the trial court's characterization of takings claim as regulatory, not physical, for statute of limitations purposes, when Forest Service restricted private rancher's water rights on federally-owned grazing land).

In distinguishing between physical and regulatory takings claims, Tahoe-Sierra neither overruled nor contradicted the Dugan, Gerlach and International Paper line of

takings cases, all of which involved physical takings. In each of those cases, the government appropriated a private party's water right by requisitioning the water for its own or a third party's proprietary and consumptive use. Dugan v. Rank, 372 U.S. 609 (1963) (finding a physical taking where the U.S. appropriated downstream riparian land owners' water rights by damming a river upstream, storing the water and diverting it to irrigation and utility projects); United States v. Gerlach Live Stock Co., 339 U.S. 725 (1950) (finding a physical taking where the U.S. appropriated downstream riparian land owners' water rights by capturing, storing and diverting water from two California rivers for sale to private energy and irrigation interests); Int'l Paper Co. v. United States, 282 U.S. 399 (1931) (finding a physical taking where the U.S. cut off International Paper's water rights and conferred them on Niagara Power Company to use for the wartime production and sale of electrical power).

Here, the government did not invade, seize, convey or convert Casitas' property to consumptive or proprietary use. Rather, it imposed regulatory operating criteria on Casitas' request to comply with the ESA through use of a fish passage facility that returns a specified amount of water diverted from the Ventura River by the Robles Diversion Dam back to its natural flow for the purpose of endangered species preservation. Mere deprivation of water from the owner of water rights without governmental invasion, appropriation or diversion of the water for consumptive or proprietary use does not amount to a physical taking under Tahoe-Sierra. The government's action restricting Casitas' right to make consumptive use of a portion of the water granted by its license is not possessory. See Loretto, 458 U.S. at 440 (stating that the multifactor Penn Central inquiry is generally applicable to nonpossessory

governmental activity). Rather, a classic regulatory restraint on natural resource development has occurred. See Stearns, 396 F.3d at 1357 (concluding that the Surface Mining Control and Reclamation Act's restrictions on a mineral estate owner's access to its mineral property and easement did not constitute a physical taking, that physical takings require physical possession or occupation, and that the property holder's "argument to the contrary is little more than an incredible attempt to transform a regulatory taking claim into a per se physical taking"); Seiber v. United States, 364 F.3d 1356, 1366 (Fed. Cir. 2004) ("regulatory restrictions on the use of property do not constitute physical takings"); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1347, 1354 (Fed. Cir. 2002) (logging restriction imposed and later lifted on privately owned land to protect threatened species under the ESA would be analyzed as a Penn Central regulatory takings claim if case not barred by ripeness doctrine) (citing Tahoe-Sierra, 535 U.S. 302 (2002)).

For this to be a physical taking requires expanding the definition to the point of erasing the line between physical and regulatory takings. Indeed, *any* property use restriction—whether on land, air, or water, and whether temporary or permanent— deprives the owner of a pre-existing right to develop at least a portion of his property for certain economic uses. Yet in Tahoe-Sierra, the Supreme Court nevertheless reaffirmed the constitutional distinction between physical acquisitions and regulatory restrictions. 535 U.S. at 321-22. Here, compliance with Section 9 of the ESA ultimately requires Casitas to leave more water in the river, thus augmenting the downstream river flow essential for protection of the endangered steelhead trout. In cooperation with the Bureau of Reclamation, Casitas can presumably accomplish this in any number of

ways; for example, by closing the Robles-Casitas Canal entrance gates and allowing fish passage through openings in the Robles Diversion Dam, or by permitting some of the water diverted by the dam to return to the river through a fish passage facility. To differentiate between these two illustrative approaches on a deceptively simple theory of "diversion" creates a perverse system of incentives, whereby form is elevated over substance, because self-selected methods of regulatory compliance can be manipulated and negotiated to arrive at preferred Fifth Amendment results. According to this pretextual logic, in the first example, water never leaves the river's flow, so there is no "diversion." In the second example, Casitas allows some already diverted water to return to the river, creating a "re-diversion." The result is the same, and should not lead to a difference in the characterization of the activity: a private property owner's choice of prophylactic actions cannot dictate whether a future takings claim will be physical or regulatory. This is particularly salient because it was Casitas who initiated Reclamation's Section 7 ESA consultations with the National Marine Fisheries Service and suggested use of the fish passage facility to ensure ESA compliance. Presumably, this approach represented the most economical way to comply with the ESA while still permitting Casitas to divert its maximum allowable allotment of water.

In sum, governmental deprivation of some water use rights absent the government's active or appropriative hand in diverting water for its own or a third party's consumptive or proprietary use does not amount to a physical taking. The only case holding to the contrary is Tulare Lake Basin Water Storage District v. United States, 49 Fed. Cl. 313 (2001), which its author expressly disclaimed in the present case in light of the intervening Tahoe-Sierra case. Casitas Mun. Water Dist. v. U.S., 76 Fed. Cl. 100,

106 (2007) ("<u>Tahoe-Sierra</u> . . . compels us to respect the distinction between a government takeover of property (either by physical invasion or by directing the property's use to its own needs) and government restraints on an owner's use of that property."). Casitas has been restrained from making full use of its California water license under certain circumstances related to the endangerment of the steelhead trout. When the government requires a usufructuary holder of water rights to allow a specified amount of dam-diverted water to circle back to its natural flow by way of a fish ladder for the purpose of endangered species preservation, a classic regulatory restriction on private property rights to prevent a public harm has occurred. It is logically incongruent to analyze ESA-based land use restrictions as regulatory takings, and ESA-based water use restrictions as physical takings. The government is not appropriating or taking possession of Casitas' property, but rather is prohibiting Casitas from making private use of a certain amount of the river's natural flow under a public program to promote the common good. Labeling such an action a physical taking blurs the line <u>Tahoe-Sierra</u> carefully draws between physical and regulatory takings.