CRV ENTERPRISES, INC. and C. Ryan Voorhees, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 06–660L.

United States Court of Federal Claims.

April 30, 2009.

Bruce Allen McIntosh and John Harvey Patton, Shapiro Buchman, Walnut Creek, California, Counsel for Plaintiffs.

William James Shapiro, United States Department of Justice, Sacramento, California, Laurie Williams, Assistant Regional Counsel, U.S. Environmental Protection Agency, Region 9, San Francisco, California, of Counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER OF DISMISSAL

SUSAN G. BRADEN, Judge.

### I. RELEVANT FACTUAL BACKGROUND.[1]

The Old Mormon Slough ("OMS") is a man-made waterway, approximately 2500–

---

1. The facts cited herein were derived from: Plaintiffs' January 23, 2008 Amended Complaint ("Am. Compl."); the April 11, 2008 Declaration of Ryan Voorhees ("4/11/2008 Voorhees Decl.");

feet long and 180–feet wide, located in Stockton, California, about fifty miles south of Sacramento. *See* Gov't Ex. 20 at DOJ 203. The OMS connects to the Stockton Deep Water Channel that, in turn, connects to the San Joaquin River. *See* 4/11/2008 Patton Decl. Ex. 5. Ships can reach the San Francisco Bay via the Stockton Deep Water Channel and the San Joaquin River. *See* 4/11/2008 Voorhees Decl. ¶ 6.

Directly south of the OMS is the former site of the McCormick & Baxter Creosoting Company ("M & B"), a wood-preserving operation. *See* Gov't Ex. 20 at DOJ 201. From 1976 to 1990, the State of California repeatedly found that M & B illegally discharged hazardous chemicals into the OMS. *Id.* at DOJ 204–06. In 1990, M & B ceased operations. *Id.* at DOJ 206.

In October 1992, the M & B site was added to the National Priorities List, authorizing the Environmental Protection Agency ("EPA") to use resources appropriated under the Comprehensive Environmental Response, Compensation, and Liability Act for environmental clean-up projects. *See* Gov't Ex. 12 at DOJ 32–33. Subsequently, the EPA conducted several removal actions to stabilize environmental conditions at the M & B site, improve security, and demolish and dispose of aboveground structures and equipment. *See* Gov't Ex. 20 at DOJ 206.

During 1996 and 1997, the EPA installed a sheet piling wall along the southwestern shoreline of the OMS to control oil seepage. *Id.* The EPA also excavated roughly 12,000 cubic yards of contaminated soil from the pond area and covered the central processing area with an asphalt cap. *Id.*

In July 1998, the EPA issued a draft Surface Water–Sediment Feasibility Study Report for the M & B site for public comment. *See* Gov't Ex. 17 at DOJ 77. The public comment period closed on November 16, 1998. *See* Gov't Ex. 19 at DOJ 183.

In January 1999, the EPA issued a final Surface Water–Sediment Feasibility Study

Report for the M & B site ("1999 Water–Sediment Report"). *See* Gov't Ex. 20 at DOJ 184. The 1999 Water–Sediment Report concluded that sediment contamination in the OMS, from toxic runoff at the M & B site, posed a potential risk to human health.

> If sediment contamination in Old Mormon Slough is not addressed, it will continue to present a risk to ecological receptors, and to human receptors who consume significant quantities of certain fish species[.] … [P]otential human health risks have been identified related to soil and groundwater contamination…. If not addressed, contaminated soil and groundwater will continue to represent potential risks to site workers and nearby residents.

*Id.* at DOJ 222.

The 1999 Water–Sediment Report analyzed several possible solutions to reduce the risk of human and environmental exposure to toxic chemicals on the sediment bottom of the OMS. *Id.* at DOJ 250–67. On March 31, 1999, the EPA issued a Record of Decision ("ROD"), adopting Alternative SD–2 to treat contamination in the OMS. *See* Gov't Ex. 21 at DOJ 358. Alterative SD–2 provided that a sand cap first would be placed over the contaminated soil to isolate areas of principal threat. *See* Gov't Ex. 20 at DOJ 259–60, 268. Then, a log boom would be placed at the mouth of the OMS to cut off navigational access over the area protected by the sand cap. *Id.* at 268. This solution was designed to prevent inadvertent erosion or other disruptions of the sand cap by marine traffic that could expose more highly contaminated sediment. *Id.* at 259–60.

The property at issue in this case lies along the northern shore of the OMS, opposite from the M & B site. *See* Gov't Ex. 29 at DOJ 436. On March 31, 1999, when the EPA issued the ROD, the property was owned by Bill T. Dutra, President of The Dutra Group. *Id.* at DOJ 429.

On September 22, 1999, the EPA advised The Dutra Group that it planned to install a

---

the April 11, 2008 Declaration of John H. Patton and Exhibits ("4/11/2008 Patton Decl. Ex. 1–11"); the Defendant ("Government's") April 15, 2008 Exhibits 1–36 In Support Of Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment ("Gov't Ex. 1–36"); and the parties' April 8, 2009 Submission Of Joint Exhibits ("Joint Sub. Ex. 1–2"). Where a Government Exhibit is cited, the DOJ page number also is provided.

sand cap and log boom across the OMS to address contaminated sediment. *See* Gov't Ex. 29 at DOJ 434. On October 20, 1999, The Dutra Group objected, because of a concern that this action would severely limit marine access to their property. *Id.* at DOJ 454. Instead, The Dutra Group suggested that the EPA consider dredging, as an alternative remediation solution. *Id.* On November 20, 2000, the EPA rejected this proposal, because it would be eleven times more expensive than the proposed remedy and no more effective. *Id.* at DOJ 460–61.

In the summer of 2000, C. Ryan Voorhees, the Director, President, and Managing Officer of CRV Enterprises, Inc. ("CRV"), became interested in The Dutra Group property, having just acquired property immediately to the north and northeast. *See* 4/11/2008 Voorhees Decl. ¶¶ 3, 7. On August 25, 2000, CRV entered into an Option Agreement with Bill Dutra to purchase the property. *See* Gov't Ex. 29 at DOJ 441. The Option Agreement contained a "Hazardous Substances" clause that provided: "[f]or the purposes of this [Option] Agreement, the McCormick & Baxter Superfund site, opposite the Property, on Mormon Slough, the Slough itself, and the 'Hazardous Substances' located thereon or thereunder, shall not be considered 'relevantly adjacent' to the Property." *Id.* at DOJ 442.

On October 1, 2001, CRV and Mr. Dutra amended the August 25, 2000 Option Agreement to allow CRV to exercise its option and close on February 1, 2002. *Id.* at DOJ 467. On November 29, 2001, representatives from the EPA and Mr. Dutra met with Mr. Voorhees to discuss the EPA's plans for the OMS. *See* Gov't Ex. 24 at DOJ 391. On January 21, 2002, however, Mr. Voorhees accused Mr. Dutra of failing to inform him of the EPA's plans for the OMS and of planned restrictions on marine traffic. *See* Gov't Ex. 26 at DOJ 426.

On January 30, 2002, the Option Agreement between CRV and Mr. Dutra again was amended. *See* Gov't Ex. 29 at DOJ 468, 471. On August 26, 2002, Mr. Voorhees met with representatives of The Dutra Group and the EPA to discuss the "Permanent Post–Construction Impacts" and a "Takings Claim." *See* Gov't Ex. 27 at DOJ 427; *see also* Gov't Ex. 28 at DOJ 428.

On October 28, 2002, a final Option Agreement was executed to reflect that CRV was "aware that the [Government] has taken the position that it has no legal obligation to pay damages or compensation for damage or injury to the Subject Property resulting from implementation of the Remedy[.]" Gov't Ex. 29 at DOJ 472. In addition, CRV was assigned all "right, title and interest in and to a certain cause of action against the United States of America for damages, loss of use, and/or taking of real property arising from or relating to EPA's implementation of the Remedy[.]" *Id.* at DOJ 473.

On November 8, 2002, CRV completed acquisition of the property. *See* Gov't Ex. 1 at DOJ 1.[2] When CRV acquired this property, the entire OMS could be used by commercial barges and small to medium sized vessels, such as motor boats, sailboats, recreational fishing boats, and house boats. *See* 4/11/2008 Voorhees Decl. ¶ 8.

## II. PROCEDURAL HISTORY.

On April 30, 2003, CRV filed an inverse condemnation action in the United States Court of Federal Claims that was assigned to the Honorable George W. Miller. *See CRV Enters., Inc. v. United States,* No. 03–867L (G. Miller, J.). At that time, the EPA had not installed the sand cap or log boom in the OMS. *See* Stip. Dis. at 1, *CRV,* No. 03–867L. On May 4, 2005, CRV and the Government entered a Stipulation to dismiss CRV's April 30, 2003 action, because the EPA had not commenced the planned remediation. *Id.* The parties stipulated that "until and unless EPA undertakes activities that CRV believes blocks its navigational access, in part or in whole, to the Old Mormon Slough and the Stockton Channel, that CRV's claims of a taking by EPA are not ripe." *Id.* at 2. On May 4, 2005, the April 30, 2003 inverse con-

---

**2.** On October 20, 2004, CRV deeded the property to Mr. Voorhees after his accountant suggested it would be more appropriate for Mr. Voorhees to hold title, since he provided the funds to purchase the property. *See* Gov't Ex. 2 at DOJ 4; *see also* 4/11/2008 Voorhees Decl. ¶ 19.

demnation case was dismissed, without prejudice.

On June 1, 2006, the EPA began construction of a two-foot fine sand cap to be placed over the sediment bottom of the OMS and the installation of a silt curtain across the mouth of the OMS channel, a temporary sheet pile, and a permanent log boom to cut off marine traffic from the capped area of the OMS. *See* Am. Compl. ¶ 24. The EPA completed the installation of both the sand cap and log boom on September 30, 2006. *Id.*

On September 19, 2006, CRV and Mr. Voorhees ("Plaintiffs") filed a second Complaint in the United States Court of Federal Claims, alleging that the EPA's OMS remediation effected a taking of Plaintiffs' private property. *See* Compl. ¶ 32. This action also was assigned to the Honorable George W. Miller. On December 20, 2006, the Government filed an Answer.

On June 11, 2007, the Government filed a Motion To Compel to require Plaintiffs to file initial disclosures and responses to interrogatories. On June 12, 2007, the court granted the Government's Motion and Plaintiffs were required to file disclosures and responses by close of business on that day.

On August 13, 2007, the parties filed a Joint Motion To Amend Discovery Schedule, requesting an additional sixty days to file dispositive motions. On August 17, 2009, the parties' Joint Motion was granted. On December 4, 2007, the parties filed a second Joint Motion, requesting an additional thirty days to complete liability related depositions and an additional forty-five days to file dispositive motions. On December 5, 2007, the court granted this motion.

On January 16, 2008, Plaintiffs filed a Motion To Amend Complaint that was granted by the court on January 22, 2009. On January 23, 2008, Plaintiffs filed an Amended Complaint, alleging that:

[the Government's] construction and maintenance of its remediation project for the M & B Site ... amounts to a public taking of and interference with plaintiffs' interests in private property [and] amounts to a public denial of and interference with the full, highest, and best use and enjoyment of such private property, and permanently destroys economically viable uses of such property.

Am. Compl. ¶ 33. Compensatory damages of $1,250,000 were requested, together with ancillary relief. *Id.* (Prayer) ¶ 1.

On January 29, 2008, the court entered a new scheduling order, setting April 15, 2008 as the date for the filing of any dispositive motions. On February 5, 2008, the Government filed an Answer to the Amended Complaint.

On April 11, 2008, Plaintiffs filed a Motion and Memorandum In Support Of Order Granting Interlocutory Summary Judgment On Liability Issues ("Pl.Mem.S.J."), together with the 4/11/08 Patton Declaration and the 4/11/08 Voorhees Declaration. On April 15, 2008, the Government filed a Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment And Memorandum In Support, together with Government Exhibits 1–36.

On May 30, 2008, Plaintiffs filed an Opposition to the United States' Motion To Dismiss Or, In The Alternative, For Summary Judgment ("Pl.Opp."), together with the 5/30/2008 Patton Declaration, 5/30/08 Voorhees Declaration, and 5/30/08 Dr. Benoit Declaration. On the same date, the Government filed an Opposition to Plaintiffs' April 11, 2008 Motion For Interlocutory Summary Judgment.

On June 6, 2008, the Government filed a Motion To Strike the Declaration of Dr. Benoit and stay the briefing schedule for dispositive motions. On June 23, 2008, Plaintiffs filed a Response. On July 7, 2008, the Government filed a Reply. On July 22, 2008, Judge George W. Miller denied the Government's Motion To Strike and set dates for final briefing on the parties' cross-motions.

* * *

On October 7, 2008, the case was transferred to the undersigned judge. On November 20, 2008, depositions were completed.

On December 22, 2008, Plaintiffs filed a Reply to the Government's April 15, 2008 Opposition ("Pl.Reply"). On the same date, the Government filed a Reply to the Plaintiffs' May 30, 2008 Opposition.

On March 24, 2009, the court held oral argument. *See* 3/24/09 TR at 1–69.

On April 8, 2009, the parties filed a Submission Of Joint Exhibits, attaching a map of Plaintiffs' property and location relative to the OMS. On April 10, 2009, the Government filed a Notice Of Supplemental Authority. On April 16, 2009, Plaintiffs filed a Response.

## III. DISCUSSION.

### A. Jurisdiction.

 The jurisdiction of the United States Court of Federal Claims was established by the Tucker Act. *See* 28 U.S.C. § 1491. This Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.... [T]he Act merely confers jurisdiction upon it whenever the substantive right exists." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *See Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) *(en banc)* ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages."). The burden of establishing jurisdiction falls upon the plaintiff. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction).

 The United States Court of Appeals for the Federal Circuit has held that the Takings Clause of the Fifth Amendment is "money-mandating." *See Moden v. United States,* 404 F.3d 1335, 1341 (Fed.Cir.2005) ("If there is a taking, the claim is founded upon the Constitution and within the jurisdiction of the Court of [Federal] Claims to hear and determine."). Therefore, "to the extent [Plaintiffs] have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper." *Id.* at 1341.

### B. The Takings Claims Alleged In The Amended Complaint.

The January 23, 2008 Amended Complaint states that this action is a "claim for money damages as compensation ... arising out of the [Government's] uncompensated taking of and injury to *real property* owned by [P]laintiffs[.]" Am. Compl. ¶ 1 (emphasis added). Specifically, the Amended Complaint describes the Government's remediation project as the "removal and stabilization actions at the ... site, including demolition and disposal of structures and equipment, excavation of contaminated soil and containment of same in a lined depository, installation of a short piling wall along the southwestern shoreline of the Mormon Channel, all intended to control oily seepages from the former oily waste pond area." *Id.* ¶ 22. The Amended Complaint also alleges that "[c]ertain of the remediation improvements ... are a permanent physical invasion, interfering with and substantially *disrupting plaintiffs' property rights ... precluding any marine access to or egress* from a substantial majority of [Plaintiffs'] property and dispossessing plaintiffs from such beneficial use and enjoyment." *Id.* ¶ 24 (emphasis added). In addition, the Amended Complaint references other "valuable maritime use[s]." *Id.* ¶ 30.

The Amended Complaint has been construed by the court to allege that Plaintiffs have an interest in real property as well as riparian rights [3] that have been adversely

---

3. "Riparian" is defined as "of, relating to, or located on the bank of a river or stream." BLACK'S LAW DICTIONARY 1352 (8th ed.2004).

affected by the Government's "construction and maintenance of [the] remediation project." *Id.* ¶ 33.

### C. The Court Does Not Have Jurisdiction To Adjudicate The Takings Claims Alleged In The Amended Complaint.

Although Plaintiffs filed a motion requesting interlocutory summary judgment on liability, nevertheless, the court first must ascertain whether it has jurisdiction to adjudicate the takings claims alleged in the Amended Complaint. *See* RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Consolidation Coal Co. v. United States,* 351 F.3d 1374, 1378 (Fed.Cir.2003) ("[U]nder federal rules any court at any stage in the proceedings may address juris-

dictional issues. Thus, even if the issue is not properly raised, this court *sua sponte* may consider all bases for the trial court's jurisdiction."). For the reasons that follow, the court has determined it does not have jurisdiction. Therefore, the court has not addressed herein numerous arguments by the parties as to the substantive merits of the takings claims alleged.

### 1. Plaintiffs Failed To Establish Any Physical Invasion Of Their Real Property.

■ Although the Amended Complaint alleged a taking of "real property," Plaintiffs have not established any physical invasion of their real property at any time. As is evident by the following ariel map submitted by the parties, the sand cap and log boom are located in the OMS.

*See e.g.,* Joint Sub. Ex. 1;[4] *see also* Gov't Ex. 1 at DOJ 1–2 (legal description of property);

**4.** This ariel map is reproduced herein with the consent of Google™.

Gov't Ex. 5 at DOJ 11 (survey of property); 3/24/09 TR at 6.

For these reasons, the court has determined Plaintiffs failed to establish any physical invasion of their real property at any time. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (stating that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government[.] ... [W]e have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause."). Likewise, neither the sand cap nor log boom denies Plaintiffs physical access via the land to their real property. *Id.*

### 2. Plaintiffs Have Alleged Regulatory Takings Claims.

 California law recognizes a "riparian right of access to the navigable part of waters" as a "protectable property right[.]" *San Francisco Sav. Union v. R.G.R. Petroleum & Mining Co.*, 144 Cal. 134, 77 P. 823, 824–25 (1904); *see also Yates v. City of Milwaukee*, 10 Wall. 497, 77 U.S. 497, 505, 19 L.Ed. 984 (1870) (a "riparian right is property, and is valuable[.]"); *Ball v. United States*, 1 Cl.Ct. 180, 183 (1982) (holding that riparian water rights "cannot be taken except for the public use and upon payment of just compensation.") (internal quotation omitted). Because the State of California retains title to all public waters, a property owner with a riparian right of access may use those waters, but that right is burdened with a servitude "in favor of the state in the exercise of its trust power over navigable waters." *Marks v. Whitney*, 6 Cal.3d 251, 263, 98 Cal.Rptr. 790, 491 P.2d 374 (Cal.1971); *see also* Cal. CONST. art. X, § 2.

 In addition, California law recognizes littoral[5] rights, *i.e.*, "a right to build a pier out to the line of navigability; a right to accretion; a right to navigation (the latter right being held in common with the general public); and a right of access from every part

of his frontage across the foreshore." *Marks*, 6 Cal.3d at 263, 98 Cal.Rptr. 790, 491 P.2d 374.

Plaintiffs have argued that the riparian right of access to the navigable part of the OMS has been taken, as well as the littoral rights "in the foreshore of their property adjacent to the OMS, rights of navigation, rights of access from every part of their frontage on the OMS across the foreshore, rights to build piers or docks slips, and rights of reasonable and beneficial use of the OMS." Pl. Mem. S.J. at 17. Specifically, the installation of the permanent log boom prevented maritime access south and east of the boom. *See* Joint Sub. Ex. 1; *see also* Pl. Mem. S.J. at 17.

In *Casitas Municipal Water Dist. v. United States*, 543 F.3d 1276 (Fed.Cir.2008), *reh'g denied*, 556 F.3d 1329 (Fed.Cir.2009), the United States Court of Appeals for the Federal Circuit recently discussed the distinction between a physical and a regulatory taking when water and related rights are at issue. In that case, the plaintiff entered into a contract in 1956 with the United States to construct a system of dams, canals, and reservoirs to provide water for Ventura County, California. *See Casitas Municipal Water Dist.*, 543 F.3d at 1280. As part of the contract, plaintiff was given a "perpetual right to use all water that becomes available though the construction and operation of the [system]." *Id.* at 1281–82. In 2003, the Bureau of Reclamation ordered plaintiff to construct a fish ladder at the intersection of two dams, to allow both upstream and downstream fish migration, to protect the endangered West Coast steelhead trout. *Id.* at 1290–91. The ladder operated by diverting water that would have otherwise ended up in a reservoir for plaintiff's use. *Id.* In 2005, plaintiff filed suit in the United States Court of Federal Claims, alleging that the Government's actions were a taking of plaintiff's water. *Id.* at 1282. The trial court ruled on a motion for partial summary judgment that a regulatory takings standard applied to

---

**5.** "Littoral" is defined as "of or relating to the coast or shore of an ocean, sea, or lake." BLACK'S LAW DICTIONARY 952 (8th ed.2004). Since

the OMS is a man-made slough, Plaintiffs arguably have no littoral rights to assert in this case.

plaintiff's claim, instead of a physical takings standard. *Id.* at 1283.

On appeal, the United States Court of Appeals for the Federal Circuit reversed, holding that the trial court first should ascertain "the character of the government action when determining whether a physical or regulatory taking has occurred." *Id.* at 1290. Our appellate court was persuaded that physical takings rules applied, because "the government did commandeer the water for a public use-preservation of an endangered species. When the government diverted the water to the fish ladder, it took [plaintiff's] water." *Id.* at 1294. Once the water was diverted down the fish ladder, it was "forever gone." *Id.* at 1296. The nature and permanence of the Government's action was characterized as a physical taking in contrast to a regulatory taking, where a restriction "merely maintain[s] the status quo" and leaves "the right in the same state it was before the government action." *Id.*

█ In this case, the Amended Complaint properly did not allege that Plaintiffs had any rights to the water in the OMS, but instead alleges that the Government remediation of the OMS "amounts to a public taking of and interference with Plaintiffs' interests in private property." *See* Am. Compl. ¶ 33. Plaintiffs further argue that the remediation effected a *"physical* deprivation of plaintiffs' riparian rights" and should be adjudicated under a physical taking standard. *See* Pl. Mem. S.J. at 18. Neither the sand cap nor the log boom, however, deprives Plaintiffs of the riparian right of access to the navigable part of the OMS. *See* Joint Sub. Ex. 1. Plaintiffs' riparian right of access to the OMS or navigation therein only was restricted, not eliminated. *Id.; see also* 3/24/09 TR at 25 (THE COURT: "Well, can a boat get to your property?" PLAINTIFF'S COUNSEL: "Yes."); TR 35 (THE COURT: "Well, you have access to the water from the property to the water frontage, there's no barrier?" PLAINTIFF'S COUNSEL: "In the notched area at the end of the property, correct, which is to the west of the log boom.").

Assuming *arguendo* that the "valuable maritime uses" alleged in the Amended Complaint are coextensive with littoral rights, as recognized by California law, Plaintiffs still have not established that they have been denied the right to build a pier or dock into the navigable portion of the OMS, the benefit of alluvion to their real property on the bank of the OMS, the ability to navigate the navigable portion of the OMS, or the use of the shoreline of their property between high and low tide. To the extent Plaintiffs cannot use the OMS from the log boom south and east to access their property, such a limited lack of access does not rise to a taking. *See Laney v. United States,* 228 Ct.Cl. 519, 661 F.2d 145, 149 (1981) ("It has always been held that where the owner has access to his property on one, two, or three sides, that his access from the property ... on one side is cut off is not a taking, even if the economic fruitfulness of the block is substantially impaired. On the other hand, if his access to his block on all four sides is cut off, that is a taking[.]"). Here, Plaintiffs have retained approximately forty percent of access to frontage of their property on the OMS. *See* Joint Sub. Ex. 1; *see also* Pl. Mem. S.J. at 17.

Therefore, the character of the Government's remediation efforts in this case is tantamount to "interference aris[ing] from some public program adjusting the benefits and burdens of economic life to promote the common good." *Loretto,* 458 U.S. at 426, 102 S.Ct. 3164. This case is not one where Plaintiffs' rights are "forever gone." *Casitas Municipal Water Dist.,* 543 F.3d at 1294. Accordingly, the court has determined that the claims alleged in this case concern regulatory takings.

### 3. Plaintiffs' Regulatory Takings Claims Are Barred By The Statute Of Limitations.

Section 2501 of Title 28 of the United States Code provides: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501.

█ As a matter of law, "[a] takings claim accrues when all the events have oc-

curred which fix the liability of the Government and entitle the claimant to institute an action." *See John R. Sand & Gravel Co. v. United States,* 457 F.3d 1345, 1355–56 (Fed. Cir.2006), *aff'd* 552 U.S. 130, 128 S.Ct. 750, 753, 169 L.Ed.2d 591 (2008) (internal quotation omitted). Our appellate court has recited this language in both physical takings and regulatory takings cases, although the application of this standard differs depending on which theory is applicable. *Compare Goodrich v. United States,* 434 F.3d 1329 (Fed. Cir.2006) (holding that a regulatory taking accrues when the Government issued a ROD that impacted plaintiff's grazing rights) *with John R. Sand & Gravel Co.,* 457 F.3d 1345 (holding that a physical taking did not accrue when the EPA issued a ROD affecting plaintiff's property). Therefore, a closer look at the facts and holding in each case is required.

*Goodrich* concerned a plaintiff who had a permit to graze cattle on the Whitetail Allotment in the Lewis and Clark National Forest. *See Goodrich,* 434 F.3d at 1331. On February 27, 1997, the United States Forest Service issued a ROD to allow the cattle of a third party also to enter and graze in the Whitetail Allotment. *Id.* at 1332. The "third party" cattle, however, did not physically enter the Whitetail Allotment until July 1, 2000, at which time plaintiff's grazing rights were diminished. *Id.* On June 9, 2004, plaintiff filed suit in the United States Court of Federal Claims alleging that, by allowing a third party to graze on the Whitetail Allotment, the Government had taken plaintiff's exclusive grazing rights, without compensation. *Id.* at 1332–33. The trial court held that the alleged taking was regulatory in nature and the issuance of the February 27, 1997 ROD, ordering the transfer of cattle marked the accrual of plaintiff's taking claim, placing plaintiff's claim outside the six-year statute of limitations. *Id.*

On appeal, the United States Court of Appeals for the Federal Circuit affirmed, holding that "the proper focus for statute of limitations purposes is upon the time of the [Government's] *acts,* not upon the time at which the *consequences* of the acts became most painful." *Id.* at 1333–34 (internal quo-

tations omitted). Therefore, the court held that the February 27, 1997 issuance of the ROD was the proper date for the accrual of the cause of action, explaining:

As between issuance of the ROD and the actual physical appropriation by cattle of water, we believe the former is a better place to deem any taking occurred. First, the question of damages is discrete from the question of claim accrual. As the court in *Fallini* [*v. United States,* 56 F.3d 1378 (Fed.Cir.1995) ] stated, the obligation to sue arises once the permanent nature of the government action is evident, regardless of whether damages are complete and fully calculable. Second, as a practical matter, it will often be much easier for the parties to correct a wrongful taking if litigation is initiated *before* its effects are felt … Thus, we conclude that the issuance of a ROD and final [Environmental Impact Statement] is sufficient to constitute the taking and hence accrue a takings claim, regardless of when the consequences of the decisions contained therein are felt.

*Id.* at 1336 (internal quotations omitted).

In *John R. Sand & Gravel Co.,* plaintiff leased a 158–acre tract in Michigan in 1969 for a fifty-year term and was given the exclusive use of the property for mining of sand and gravel. *See John R. Sand & Gravel Co.,* 457 F.3d at 1347. When plaintiff signed the lease, a landfill was in operation on the northern portion of the leased property. *Id.* During the landfill's operation, it illegally accepted and buried drums of solid and liquid industrial waste. *Id.* In 1980, the landfill was closed, and in 1984 was listed by the EPA as a Superfund site because of the large amount of hazardous waste that was buried beneath the land. *Id.* at 1347–48.

In 1986, a ROD was issued for the site requiring the EPA to excavate buried drums, take soil samples, install groundwater monitoring wells, and construct a storage pad. *Id.* at 1348. In 1990, the EPA issued a second ROD requiring construction of a fence around the site to restrict access, but the ROD did not provide the metes and bounds of the fence. *Id.* In the winter of 1992–1993, the EPA erected a fence that enclosed sixty percent of the site, preventing

plaintiff access to mining operations. *Id.* Subsequently, with the EPA's consent, plaintiff relocated the fence so mining operations could resume. *Id.* In February 1994, the EPA constructed a new internal security fence that cut off the plaintiff's access. *Id.* The plaintiff's mining operations continued until 1996, despite the fencing. *Id.* at 1348–49.

On May 20, 2002, a suit was filed in the United States Court of Federal Claims alleging that the EPA's remedial action, including the construction of a fence, was a permanent physical taking of plaintiff's right to mine sand and gravel. *Id.* The trial court held that the Government's obstruction of plaintiff's access to the leased property was not a taking, because plaintiff could not demonstrate a legally-cognizable property interest. *Id.* at 1351. In addition, the trial court determined that the date of accrual for plaintiff's takings claim was 1998, when the EPA completed the final relocation of the fencing. *Id.*

Although the United States Court of Appeals for the Federal Circuit recognized that plaintiff's mining rights were private property, the takings claim was barred by the statute of limitations, because a "physical occupation by the government only comprises a taking when that occupation is permanent." *Id.* at 1357 (internal quotations omitted). A government occupation is permanent "when the government's intrusion is a substantial physical occupation of private property." *Id.* (internal quotations omitted). Therefore, plaintiff's cause of action accrued when the internal security fence was initially completed in 1994 and the EPA took possession of the former landfill site "bar[ing] [plaintiff] from portions of the [ ] property." *Id.*

In holding July 1994 as the date of accrual, the court observed that the EPA's issuance of RODs in 1986 and 1990 "was not sufficient for a physical takings claim to accrue in this case." *Id.* at 1357 n. 10. The court acknowledged that *Goodrich* took a different view of the effect of an ROD, but distinguished that decision in this way:

> First, unlike *Goodrich,* [plaintiff's] claim is for a physical taking, rather than a regulatory taking. Second, the two RODs issued with regard to the [landfill] did not contain the level of detail about the government's action necessary for a claim to accrue … The 1986 ROD did not set forth the long-term plan for site remediation challenged by [plaintiff]. The 1990 ROD did propose a long-term remediation plan involving a landfill cap system. However, the ROD did not set forth the metes and bounds of the landfill cap or a specific time frame for its completion.

*Id.*

██ In this case, Plaintiffs and the Government disagree on the date the alleged takings claims accrued. Plaintiffs argue that the takings accrued on September 30, 2006, when construction of the log boom was completed. *See* 3/24/09 TR at 19–20. On the other hand, the Government argues that the takings accrued on March 31, 1999, when the ROD was issued. *Id.* at 12.

Since the court has determined that Plaintiffs' only viable claims were regulatory takings, the date of accrual is March 31, 1999, when the ROD was issued. *See Goodrich,* 434 F.3d at 1336. The Amended Complaint, however, was not filed in this case until September 19, 2006, more than six-years later. *See* Am. Compl. Recognizing this fatal jurisdictional defect, Plaintiffs argue that the statute of limitations should be tolled or that the Government be estopped from raising a statute of limitations argument based on the filing and dismissal of the April 30, 2003 inverse condemnation claim arising out of the same events. *See* Pl. Reply at 2; *see also* TR at 18. Plaintiffs argue that in similar situations in the past, the court has ruled that "the timely filing of the initial takings action against the Government equitably tolls the running of the statue of limitations". *See* Pl. Opp. at 18 (citing *George F. Miller Farms, Ltd. v. United States,* 27 Fed.Cl. 672, 672–73 (1993)). Plaintiffs argue that since the Government agreed that Plaintiffs' takings claims were not ripe, the "doctrine of judicial estoppel prevents the Government from now asserting this [statue of limitations] defense." *Id.* (citing *New Hampshire v. Maine,* 532 U.S. 742, 749–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

In 2008, however, the United States Supreme Court held that the statute of limitations in 28 U.S.C. § 2501 is "jurisdictional" in nature. *See John R. Sand & Gravel Co.*, 128 S.Ct. at 753. Rather than protecting "a defendant's case-specific interest in timeliness," the Court explained that a jurisdictional statute of limitations works "to achieve a broader system-related goal, such as facilitating the administration of claims, limiting the scope of a government waiver of sovereign immunity, or promoting judicial efficiency." *Id.* at 753 (citations omitted). Thus, jurisdictional statutes of limitations require "a court to decide a timeliness question despite a waiver, or [forbid] a court to consider whether certain equitable considerations warrant extending a limitations period." *Id.* Therefore, it is now settled that equitable tolling and estoppel do not extend the six-year statute of limitations embedded in 28 U.S.C. § 2501. *See Black v. United States*, 84 Fed.Cl. 439, 450 (2008) ("[E]quitable tolling … is foreclosed by the Supreme Court's decision in *John R. Sand & Gravel Co.*"); *see also Adde v. United States*, 81 Fed.Cl. 415, 421 (2008) ("Equitable tolling of § 2501 is now foreclosed by binding precedent, as are similar arguments based on the doctrines of estoppel and waiver."). Accordingly, the May 4, 2005 Stipulation has no legal effect as a waiver in this case.

On the other hand, it is correct that a regulatory taking accrues only when "the claimant knew or should have known that the claim existed." *Goodrich*, 434 F.3d at 1333 (internal quotations omitted). Therefore, Plaintiffs' counsel asserted at oral argument that, because the March 31, 1999 ROD did not provide any specific information about the installation of a log boom, Plaintiffs could not have known that a log boom restricting their property's marine access would be part of the EPA's planned remediation. *See* 3/24/09 TR at 41–43. The March 31, 1999 ROD only references the erection of "institutional controls" and does not discuss the imposition of a log boom or where it would be located. *Id.* Therefore, Plaintiffs argue that a taking did not accrue on that date because, without any specific detail, they could not have known that a claim existed. *Id.*

Although the ROD does not specifically mention a log boom, there was more public information available about the EPA's plans than Plaintiffs admit. *See* Gov't Ex. 21 at DOJ 355–59. In discussing the eastern portion of the OMS where the sand cap would be installed, the ROD states: "[s]imilar institutional controls would be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disruption of in-situ sediment cap materials that could cause exposure of more highly contaminated sediment under the cap." *Id.* at DOJ 359. "Similar" refers to the previous paragraph, where the ROD states: "[i]nstitutional controls to limit navigational access to the slough." *Id.* at DOJ 359. Therefore, the ROD makes clear that navigational access to the OMS will be restricted by "institutional controls."

In addition, other public documents provide specific information about the log boom construction. In July 1998, a draft of the Surface Water–Sediment Feasibility Study Report was released for public comment. *See* Gov't Ex. 17 at DOJ 77. That report analyzed several proposed remedial actions for treating contamination in the OMS. *Id.* Alternative SD–2, the remedy of capping a portion of the OMS that ultimately was specified in the ROD, provides a map of the OMS that specifically identifies the log boom and where it would be placed. *Id.* at DOJ 138. The location identified on the draft Report map matches the present location of the log boom. *Compare id. with* Joint Sub. Ex. 1. The January 1999 Final Report contains the same map identifying the placement of the log boom. *See* Gov't Ex. 20 at DOJ 268. Together these public documents establish that Plaintiffs should have known a claim existed when the EPA issued the March 31, 1999 ROD.

For these reasons, the court has determined that any claim for a regulatory taking, based on the EPA's March 31, 1999 remediation plan for the OMS, accrued on March 31, 1999, when the EPA issued the ROD and rendered the takings claims alleged in the Amended Complaint barred by 28 U.S.C. § 2501.

4. **In The Alternative, Plaintiffs Did Not Own The Property At Issue On March 31, 2000, When The Alleged Taking Claims Accrued.**

 Neither of the Plaintiffs owned the property at issue on March 31, 1999, when the EPA issued the ROD requiring the installation of a sand cap and log boom in the OMS. In fact, on that date, Mr. Dutra was the sole owner of the property. The property was not acquired by CRV until November 8, 2002. *See* Gov't Ex. 1 at DOJ 1 (10/29/2002 Deed). And, it was not until October 20, 2004 that CRV transferred title of the property to Mr. Voorhees. *See* Gov't Ex. 2 at DOJ 4. Without "a valid property interest at the time of the taking," Plaintiffs have no cause of action for compensation under the Fifth Amendment of the United States Constitution. *See Cienega Gardens v. United States,* 331 F.3d 1319, 1328 (Fed.Cir. 2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken, even for regulatory takings."); *see also Wyatt v. United States,* 271 F.3d 1090, 1096 (Fed.Cir.2001) ("It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation."). In addition, it is irrelevant that Mr. Dutra attempted to assign any claims against the Government to CRV. *See* Gov't Ex. 29 at DOJ 472. "It is well established . . . that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property." *United States v. Dow,* 357 U.S. 17, 20, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); *see also* 31 U.S.C. § 3727(b) ("An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."). Accordingly, Plaintiffs also do not have standing to assert the takings claims alleged in the Amended Complaint.

## IV. CONCLUSION.

For the above reasons, the Government's April 15, 2008 Motion is granted in part and denied in part, as moot. Plaintiffs' April 11, 2008 Motion is denied. The January 23, 2008 Amended Complaint is dismissed, with prejudice.

**IT IS SO ORDERED.**