# United States Court of Appeals for the Federal Circuit

---

**CRV ENTERPRISES, INC.** AND
**C. RYAN VOORHEES,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2009-5100

---

Appeal from the United States Court of Federal Claims in case no. 06-CV-660, Judge Susan G. Braden.

---

Decided: November 17, 2010

---

JOHN H. PATTON, Patton Martin & Sullivan LLP, of Pleasanton, California, argued for plaintiffs-appellants.

AARON P. AVILA, Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, for defendant-appellee. With him on the brief was IGNACIA S. MORENO, Assistant Attorney General.

---

Before RADER, *Chief Judge*, LINN, and DYK, *Circuit Judges.*

DYK, *Circuit Judge.*

CRV Enterprises, Inc. and C. Ryan Voorhees ("plaintiffs") filed a claim against the United States in the Court of Federal Claims ("Claims Court"), alleging that the United States had taken plaintiffs' private property without just compensation by erecting a log boom that prevented plaintiffs from utilizing a slough adjacent to their property. The Claims Court held that plaintiffs failed to state a physical takings claim and that any regulatory takings claim was barred by the statute of limitations. *CRV Enters., Inc. v. United States*, 86 Fed. Cl. 758, 764–69 (2009). Alternatively, the court held that plaintiffs had no standing to assert a regulatory takings claim because they did not own the property when the regulatory takings claim accrued. *Id.* at 770. We agree that plaintiffs did not state a physical takings claim and that their regulatory takings claim was barred because they did not own the property at the time of the governmental action. Accordingly, we affirm.

## BACKGROUND

The following are either facts alleged in the complaint or established by state law. The property is a nine acre piece of land, located on the northern shore of the Old Mormon Slough ("Slough"). The Slough is a man-made waterway in Stockton, California connected to the Stockton Deep Water Channel, which in turn flows into the San Joaquin River and then the San Francisco Bay. As landowners adjacent to the Slough, plaintiffs are riparian property owners under California law and have a "riparian right of access to the navigable part of waters." *See*

*id.* at 765 (citing *San Francisco Sav. Union v. R.G.R. Petroleum & Mining Co.*, 77 P. 823, 824 (Cal. 1904)).[1]

In general, riparian rights include the right "(i) of access to the water; (ii) to build a wharf or pier into the water, (iii) to use the water without transforming it, (iv) to consume the water, [and] (v) to accretions."[2] Robert E. Beck, *Waters & Water Rights* § 6.01(a) (3d ed. 2009). The right to access "means the right of ingress and egress to one's land by way of the water, or to the water from the land." *Id.* § 6.01(a)(1). Plaintiffs also assert littoral rights, which historically applied only to landowners adjacent to lakes but, more recently, have frequently been seen as indistinguishable from riparian rights. *See id.* § 6.02(b). According to California law, littoral rights protect "a right to build a pier out to the line of navigability; a right to accretion; a right to navigation (the latter right being held in common with the general public) . . . ; and a right of access from every part of his frontage across the foreshore."[3] *Marks v. Whitney*, 491 P.2d 374, 382 (Cal. 1971) (in bank).

---

[1]     For convenience, at places in this opinion we treat CRV and Voorhees as joint owners of the property. In fact, as described below, CRV transferred the property to Voorhees in 2004.

[2]     Accretion is "the slow, virtually imperceptible, build up of alluvium along the bank of a waterbody" that essentially adds new land to the shoreline. Robert E. Beck, *Waters & Water Rights* § 6.01(a)(5) (3d ed. 2009).

[3]     Littoral means "of or relating to the coast or shore of an ocean, sea, or lake." *Black's Law Dictionary* 952 (8th ed. 2004). Because the Slough is a man-made body of water, the Claims Court noted that plaintiffs arguably have no littoral rights. *CRV Enterprises*, 86 Fed. Cl. at 765 n.5. However, it proceeded with its analysis under the assumption that plaintiffs had littoral rights, and we do the same.

Before plaintiffs acquired the property in 2002, between 1942 and 1990, wood-preserving operations at the McCormick and Baxter Creosoting Company ("McCormick and Baxter"), located on the southern shore of the Slough across from plaintiffs' property, resulted in the release of hazardous chemicals, including carcinogens, into the soil, Slough, and sediment at the bottom of the Slough. As a result, in 1992, the Environmental Protection Agency ("EPA") added the McCormick and Baxter site to its Superfund National Priorities List. The Superfund site included the contaminated sediment in the Slough. After studying the extent of the contamination of the Slough, EPA determined it posed unacceptable risks to humans and fish. It then, in March 1993, issued a draft report evaluating different remedial alternatives, including "Alternative SD-2," which involved installation of a two-foot thick sand cap over three-fourths of the Slough's bed and "institutional controls" to prevent navigation and dredging in the capped portion of the Slough that would expose the contaminated sediment. The final report, issued in January 1999, reiterated that, under "Alternative SD-2," "institutional controls would be implemented for the capped portion of [the Slough]." J.A. 731. Both the draft report and the final report defined "institutional controls" in a prior section, which explained that "institutional controls . . . include[d] the installation of a log boom." J.A. 595, 725. In fact, the final report included a diagram of "Alternative SD-2," which explicitly marked the site of the log boom. J.A. 740.[4] In March 1999, EPA finally issued its Record of Decision ("ROD"). The ROD explicitly adopted "Alternative SD-2" from the final report and provided for the sand cap and "institutional controls

---

[4]    See the appendix to this opinion for a map of the Slough area after the erection of the log boom, J.A. 1337, and the diagram in EPA's final report, J.A. 740.

to limit navigational access," i.e., the log boom.  J.A. 830–31.

During the time that EPA was determining the necessary steps, Bill Dutra ("Dutra") owned the property, situated across the Slough from the McCormick and Baxter site.  The EPA's installation of the log boom threatened to deprive Dutra of use of the portion of the Slough located behind the log boom.  In October 1999, Dutra objected to the EPA's action and submitted an alternative proposal, which the EPA rejected on November 20, 2000.  In August 2000, after the issuance of the ROD, CRV signed an option agreement with Dutra to acquire the property.  CRV, which owned other land adjacent to the property, hoped to develop the property as "part of a mixed use master plan development" that included a marina, boat slips, dry boat storage facilities, marine sales and service facilities, restaurants, and lodging.  J.A. 102–03.  In November 2001 and August 2002, Dutra and Voorhees both met with EPA to discuss the remediation plans, and EPA reiterated that its plan included installing a sand cap on three-fourths of the Slough and placing a log boom across the Slough to block boat traffic.  As a result, CRV and Dutra entered into an amended option agreement in October 2002, acknowledging Dutra had failed to reach a "mutually acceptable agreement" with EPA.  J.A. 946.  Finally, in November 2002, CRV exercised its option and acquired the property from Dutra, who also assigned his rights to CRV.  The property was transferred to Voorhees on October 20, 2004.

CRV filed an inverse condemnation claim against the United States on April 30, 2003 ("the CRV I case"), alleging that EPA's planned implementation of the remediation project was a taking.  The United States, denying a taking had occurred, also argued CRV's takings claim was not ripe because the remedy had not yet been imple-

mented. When work on the remedy was delayed for over a year, CRV and the United States filed a Stipulation for Dismissal without prejudice, agreeing the claim was not yet ripe. The joint motion stated that "CRV acknowledges (and Defendant concurs) that unless and until the EPA undertakes activities that Plaintiff believes blocks its navigational access, in part or in whole, to the Old Mormon Slough and the Stockton Channel, Plaintiff's claims as pled in this action are not ripe." J.A. at 1141.

In September 2006, EPA finally completed installation of the sand cap and log boom. The log boom was erected by driving two pilings into the bed of the Slough and then stringing the boom between the pilings; the plaintiffs do not own the Slough bed or the water, and the boom does not touch the property. Also, plaintiffs retained the ability to access the uncapped portion of the Slough from the property, as about forty percent of its shoreline touched the uncapped portion and allowed free access into the adjacent Stockton Water Channel. The log boom did, however, prevent plaintiffs from navigating from the uncapped portion of the Slough to their shoreline behind the boom or from the portion of the Slough behind the boom into the uncapped part of the Slough and the Deep Water Channel beyond. EPA also posted a warning sign, affixed to one of the log boom pilings and facing out toward the mouth of the Slough, stating "DANGER NO ENTRY—Capped Sedimants (sic) Beyond this Point— Hazardous Materials." J.A. 375, 410.

On September 19, 2006, plaintiffs filed suit against the United States in the Claims Court, alleging that the installation of the log boom constituted a Fifth Amendment taking. The Claims Court dismissed plaintiffs' complaint, finding that the plaintiffs alleged no physical taking. It also held that any potential regulatory takings claims were barred by the statute of limitations, which,

according to the Claims Court, began running with EPA's issuance of the ROD on March 31, 1999, or, alternatively, that plaintiffs had failed to establish standing because they did not own the property when the ROD was issued.

Plaintiffs timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review de novo the Claims Court's decision to dismiss. *Banks v. United States*, 314 F.3d 1304, 1307–08 (Fed. Cir. 2003).

DISCUSSION

I

Plaintiffs' primary contention is that EPA's installation of the log boom is a physical taking. Decisions of the Supreme Court have drawn a clear line between physical and regulatory takings. The former involve a physical occupation or destruction of property, while the latter involve restrictions on the use of the property. *Compare Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (finding a permanent physical invasion where state required owners to allow cable lines to be placed on their buildings), *and United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (finding a physical taking where government took control of mine by requiring officials to "conduct operations as agents for the Government"), *with Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) (finding no physical taking where regulation restricted owner's use of the airspace above his building), *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155 (1958) (finding no physical taking where government ordered gold mine to stop operations temporarily), *and Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987) (finding no physical taking where government required half of the coal beneath certain structures to be kept in place).

The distinction is important because physical takings constitute per se takings and impose a "categorical duty" on the government to compensate the owner, whereas regulatory takings generally require balancing and "complex factual assessments," utilizing the so-called *Penn Central* test. *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322–23 (2002) (internal quotations omitted). If the alleged taking is a physical taking, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, [the Supreme Court has] required compensation." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992).

Here, there has been no physical invasion of the plaintiffs' land. The log boom is anchored to the bottom of the Slough. Plaintiffs do not contend that they own the bed of the Slough.[5] Nor do the plaintiffs claim that they own the water itself. In fact, plaintiffs admit they do "not assert that [they] owned the [Slough], the waters within it, or the Slough's bed." Appellant's Reply Br. 8. Riparian and littoral rights do not convey ownership to the water but only rights to use the water. *See United States v. State Water Res. Control Bd.*, 227 Cal. Rptr. 161, 167–68 (Cal. Ct. App. 1986) ("[W]hat is meant by a water right is the right to *use* the water."). Plaintiffs admit that "[t]he riparian owner, of course, does not own title to the waters (the State does, in public trust), but rather the rights to use it." Appellant's Br. 26. However, plaintiffs assert that the United States, by restricting their right to use the Slough, has physically taken their riparian and littoral rights to access.

---

[5]    *Compare United States v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne*, 337 F.2d 956, 958 (3d Cir. 1964) (plaintiff owned the submerged land over which a pipeline was laid).

Plaintiffs are correct that action not occurring on a plaintiff's land can still lead to a physical taking of water rights. As the Supreme Court noted in *Dugan v. Rank*, 372 U.S. 609, 625 (1963), "[a] seizure of water rights need not necessarily be a physical invasion of land." For example, the Supreme Court and this court have found a physical taking of riparian water rights when water in which the plaintiff held use rights was permanently removed. *See id.*; *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 752–53 (1950); *Casitas*, 543 F.3d at 1289–96. However, these cases do not hold that a physical taking of water rights occurs merely when a particular use of the water is restricted.

For example, both *Gerlach* and *Dugan* involved the construction of the Friant Dam in California, which "diverted [water from the San Joaquin River] through a system of canals . . . to irrigate more than a million acres of land, some as far as 160 miles away." *Gerlach*, 339 U.S. at 729; *see Dugan*, 372 U.S. at 612–14. In *Gerlach*, the diversion left a virtually "dry river bed . . . below the dam" and ended the "natural seasonal overflow" of the San Joaquin River onto the plaintiffs' lands, to which the plaintiffs held private riparian rights. 339 U.S. at 729–30. The Court analyzed this deprivation as a physical taking, characterizing the action as an "expropriation" that "destroyed and confiscated a recognized . . . property right." *Id.* at 752–53. Similarly, in *Dugan*, landowners having riparian rights to the San Joaquin River downstream from the dam, alleged that insufficient water remained to satisfy their rights. 372 U.S. at 614–16. The Court held this physical removal of the water was a partial physical taking. *Id.* at 620, 625.

In *Casitas*, this court held that a government-mandated fish ladder that would "divert water from [the plaintiff's property], resulting in a permanent loss . . . of a

certain amount of water per year" should be analyzed as a physical taking. 543 F.3d at 1282, 1289, 1296. Casitas owned a water project that provided a county water supply and, by contract with the government, owned "the perpetual right to use all water that becomes available through" the project. *Id.* at 1282. The fish ladder "physically diverted" water from the project, rendering the water "forever gone." *Id.* at 1291, 1296. The court compared this deprivation to the *Dugan* and *Gerlach* cases and contrasted it from cases where the use of natural resources was merely restricted. *Id.* at 1289-95.

Thus, the prior water rights cases finding a physical taking involved instances where the "United States physically diverted the water, or caused water to be diverted away from the plaintiffs' property" such that water was removed entirely and the plaintiffs "right to use that water, [was] forever gone." *Casitas*, 543 F.3d at 1290, 1296. Unlike *Casitas*, *Gerlach*, and *Dugan*, plaintiffs have not shown any physical appropriation of water or the actual removal of any amount of water. Here, all of the water remains in the Slough, and plaintiffs are still able to use it, even if not for the particular use of navigation that they desired. Plaintiffs' preferred use of its property, as a launch for navigation into the Slough, has not even been completely taken away. It is undisputed that about forty percent of its shoreline still touches the navigable portion of the Slough and provides access to the larger waterways beyond.

In similar circumstances, we have held that a government's action limiting the use of a plaintiff's water without physically removing the water is not a physical taking. *See Washoe Cnty v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003). In *Washoe*, the Department of the Interior denied a permit to build a pipeline from the water source (owned by Washoe County) over federal land. *Id.*

at 1322–23.  The county argued that denial of the permit "ensured that their groundwater remained [in its original location]" and thus constituted a physical taking.  *Id.* at 1325.  We noted that the government "neither physically diverted or appropriated any water nor physically reduced the quantity of water that [was] available." *Id.* at 1327.  We concluded the county "still retained the right to use the water" but simply could not use the water for its preferred purpose.  *Id.*  Under *Washoe*, even if the government's restriction on navigation in the capped portion of the Slough had completely deprived plaintiffs of their preferred use of the water, that fact alone would not make the government's action a physical taking.  There must be a physical appropriation or destruction of the water, not just a restriction on the use of the water that remains in place.

If a mere use restriction that interferes with one of a property owner's rights were enough to support a compensable physical taking, almost every regulatory taking would be a physical taking.  Plaintiffs appear to try to avoid this result by arguing that it is the "*physical* erection of the boom" as a "*physical* barrier" that constituted the taking in this case.  *See* Appellant's Br. 30, 34 (emphasis added).  However, the mere fact that the government's regulatory action included some sort of physical instrument does not change the fact that the government action merely restricted plaintiffs' use of its property and did not physically remove any of the water from the Slough.[6]  Because plaintiffs cannot show that the gov-

---

[6]    *See, e.g.*, *Warren v. City of Athens*, 411 F.3d 697, 705 (6th Cir. 2005).  In *Warren*, the government blocked the drive-thru entrance to a Dairy Queen by erecting barriers "along," but not on, the restaurant's property.  *Id.* at 702.  The barriers prevented customers from using the drive-thru and refuse trucks from removing trash from

ernment has physically appropriated its water rights by removing water entirely, we affirm the Claims Court's dismissal of plaintiffs' physical takings claim.

## II

Although plaintiffs have no valid physical takings claim, they arguably asserted a regulatory takings claim in their complaint. Even assuming that such a claim was asserted, the Claims Court was correct to dismiss it. In dismissing the regulatory takings claim, the Claims Court relied upon its conclusion that the statute of limitations had run on the claim. Plaintiffs urge that, because of the government's position during the CRV I case that plaintiffs' claim was not ripe and the stipulation entered by both parties agreeing the claim was not ripe, the government is now judicially estopped to argue that the regulatory takings claim accrued before the log boom was installed. Judicial estoppel is an equitable doctrine, designed to "protect the integrity of the judicial process" by "prevent[ing] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotations omitted). Under the doctrine, courts weigh whether (1) the supposedly contradictory positions are "clearly inconsistent," (2) the party succeeded in persuading the lower court of its earlier position, and (3) the party would derive an unfair advantage from the inconsistent advantage. *Id.* at 750. The government urges that judicial estoppel cannot apply to the United States and argues that, in any

the back of the building. *Id.* The court stated that the plaintiffs did not raise a physical takings claim because they did not "contend[] that the City placed its barriers or otherwise physically encroached *on their property*." *Id.* at 705.

event, it has not taken inconsistent positions. We need not decide the issue because plaintiffs did not own the property at the time of the alleged regulatory taking and therefore lacked standing.

The Claims Court determined that plaintiffs could not raise a regulatory takings claim because they did not own the property when EPA issued its ROD and, hence, did not have a "valid property interest at the time of the taking." *CRV Enters.*, 86 Fed. Cl. at 770. It is well established that "only persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001); *see also Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008); *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir. 2008); *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003).[7] At oral argument CRV conceded that "if the regulatory taking occurred . . . before my clients acquired the property there would be a standing issue." Oral Arg. at 9:25–9:35, *available at* http://www.cafc.uscourts.gov. But plaintiffs maintain that the relevant government action here was not the ROD, which directed the destruction of use by the installation of a log boom, but the actual installation of the log boom itself.

The Supreme Court has held that a takings claim does not accrue when Congress enacts an overall statutory scheme that authorizes the government action; instead the claim ripens when particular restrictions are

---

[7] Additionally, any attempted assignment of the takings claim by Dutra to plaintiffs would be ineffective because "[i]t is well established . . . that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property." *United States v. Dow*, 357 U.S. 17, 20 (1958); *see also* 31 U.S.C. § 3727(b).

actually imposed. *See Palazzolo v. Rhode Island*, 533 U.S. 610, 617, 620–21 (2000). In *Palazzolo*, the Court found the existence of background principles of state law, such as statutes and regulations granting general regulatory authority, did not deprive a later owner of the ability to sue for a regulatory takings claim when the authority was exercised. *Id.* at 628–30. In *Palazzolo*, the claim did not ripen when Rhode Island enacted legislation creating an agency "charged with the duty of protecting the state's coastal properties" or when "[r]egulations promulgated by the Council designated salt marshes like those on [the plaintiff's] property as protected 'coastal wetlands.'" *Id.* at 614. The claim did not ripen until after the plaintiff submitted development applications that were denied. *See id.* at 618–20. In determining ripeness, the Court stated the claim ripened when "the government entity charged with implementing the regulation has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 618 (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985)). Furthermore, the Court explained, once "the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Id.* at 620.

Similarly, in *Goodrich v. United States*, 434 F.3d 1329, 1331–32 (Fed. Cir. 2006), it was alleged that the regulatory taking claim accrued when the Forest Service implemented an ROD and permitted cattle to enter the plaintiff's grazing area. We held that the claim accrued when the ROD was issued, not when it was implemented. *Id.* We explained that "a claim accrues when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action" and when "the permanent nature of the government action is evident." *Id.* at 1333, 1336 (internal quotation

omitted).  We reasoned that an ROD was "sufficient to accrue a takings claim" because it is "clearly final." *Id.* at 1335.  We further noted that it would be unfair to make property owners wait to sue until implementation of a regulation had occurred.  *Id.* at 1336.  In many cases, if plaintiffs were "required to wait until [implementation], it might be impractical, if not nearly impossible, to right the wrong." *Id.*

Under *Palazzolo* and *Goodrich*, CRV's regulatory takings claim accrued and ripened with the issuance of the ROD in March 1999.  By that point, the government entity charged with implementing the Superfund program, EPA, had "reached a final decision regarding the application of the regulations to the property at issue," *Palazzolo*, 533 U.S. at 618, and "the permanent nature of the government action [was] evident," *Goodrich*, 434 F.3d at 1335.  The EPA's ROD required the installation of a log boom.  Although the implementation date remained in the future, the ROD represented EPA's final decision that it would install a log boom.  At that point, it was clear the United States' action would be permanent.  The final decision fixed "the permissible uses of the property . . . to a reasonable degree of certainty" because it became clear that the owner of the property would not be able to freely navigate to and from the area behind the planned log boom. *See Palazzolo*, 533 U.S. at 620.

As such, the claim was ripe when the ROD was issued in March 1999.  CRV did not enter into its option agreement with Dutra until August 2000, and it did not exercise its option to purchase the property until November 2002.[8]  Because the claim accrued and ripened before

---

[8]    Even if the final government action were deemed to be EPA's November 20, 2000, refusal to modify the proposal in response to Dutra's alternative plan, the

plaintiffs acquired the property, plaintiffs cannot state a regulatory takings claim.  That claim, if it existed, was owned by the prior owner.

We conclude that plaintiffs did not state a valid physical takings claim, and, to the extent they allege a regulatory takings claim, that claim is barred because plaintiffs did not own a valid property interest at the time of the alleged regulatory taking.

**AFFIRMED**

---

action would still have been taken before the transfer of the property in November 2002.

# APPENDIX

Map of Slough Area After Permanent Log Boom Installation



"©2009 Google, Map Data © Tele Atlas.

Diagram of EPA's Alternative SD-2, Adopted in its Record of Decision



Figure 4.1. Alternative SD-2, In Situ Capping